Argued and submitted November 26, 2014, portion of judgment requiring
defendant to pay attorney fees reversed, otherwise affirmed June 2, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GARY LEE ROSE,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1200025; A154758

377 P3d 613

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Garrett, Judge, and Edmonds, Senior Judge.

**ORTEGA, P. J.**

A jury found defendant guilty of two counts of first-degree unlawful sexual penetration, ORS 163.411(1)(b), seven counts of using a child in a display of sexually explicit conduct, ORS 163.670(1), and four counts of first-degree sexual abuse, ORS 163.427(1)(a)(A). Defendant appeals the resulting judgment, asserting three assignments of error. First, he argues that the trial court erred in concluding that his statement, "I don't have nothing to say," during a police interrogation was neither an unequivocal nor equivocal assertion of his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution. Second, he asserts that the trial court erred in excluding evidence that the victim had made prior false accusations of sexual abuse against her stepbrother. Third, he asserts that the trial court plainly erred when it ordered him to pay $16,000 in court-appointed attorney fees in the absence of evidence that he had the "ability to pay."

We reject defendant's first assignment of error, concluding that defendant's statement, when considered in the totality of the circumstances and the facts found by the trial court, was an assertion that defendant had no response to being confronted with incriminating photographs from his cell phone, and that a reasonable officer would not have understood the statement to constitute an unequivocal or equivocal invocation of his right against compelled self-incrimination. We also reject defendant's second assignment of error, concluding that the trial court did not err in excluding the victim's prior accusations against her stepbrother, because the record supports the trial court's finding that there was insufficient evidence that the victim had recanted those accusations, and to the extent that there was a question about the veracity of her accusations, the trial court properly exercised its discretion to exclude the evidence because its probative value was substantially outweighed by the risk of prejudice. Finally, the state concedes error as to the court-appointed attorney fees, and we accept that concession. Accordingly, we reverse the portion of the judgment requiring defendant to pay attorney fees, and otherwise affirm.

We generally discuss the relevant facts during our analysis of each assignment of error, but offer context with

the following undisputed background facts. The nine-year-old victim reported to her aunt that defendant—the victim's mother's boyfriend—had sexually abused her and recorded sexually explicit photographs and video of her using his cell phone. The victim's aunt took the victim to the hospital for an evaluation. When defendant and the victim's mother arrived at the hospital, a sheriff's deputy accompanied them to a security office, told them about the allegations, and seized defendant's phone. Detectives Voss and Garrett later arrested defendant, gave him *Miranda* warnings, and interrogated him in an interview room at the Milwaukee Police Station. After the detectives questioned defendant for about an hour, they confronted him with incriminating photographs from his cell phone. In response to a question about why the photographs were on his phone, defendant stated, "I don't have nothing to say." Detectives continued to question defendant, and he made several incriminating statements.

A grand jury later indicted defendant on 14 counts—the counts on which he ultimately was convicted, and a count of first-degree sodomy that the state dismissed before trial. Defendant moved to suppress statements he made during interrogation. He argued that he had invoked his right against compelled self-incrimination at seven distinct points in the interrogation, and urged suppression of all of his statements made after the first asserted invocation. The trial court concluded that his first asserted invocation—"I don't have nothing to say"—was not an invocation and, thus, the trial court did not suppress the statements defendant made immediately thereafter. The court agreed with defendant, however, that, about a half hour later, he equivocally invoked his right against compelled self-incrimination when he said, "I really don't want to talk about it." Accordingly, because the officers failed to ask clarifying questions, the trial court suppressed all of defendant's statements made after that equivocal invocation.

## INVOCATION OF RIGHT AGAINST COMPELLED SELF-INCRIMINATION

Under Article I, section 12,[1] "police must cease custodial interrogation when a criminal suspect unequivocally

---

[1] Article I, section 12, provides, in part, "No person shall * * * be compelled in any criminal prosecution to testify against himself."

invokes his or her right against self-incrimination." *State v. Avila-Nava*, 356 Or 600, 602, 341 P3d 714 (2014). If a suspect makes an ambiguous or equivocal invocation of rights under Article I, section 12, the police must ask follow-up questions to clarify what the suspect meant before proceeding with the interrogation. 356 Or at 609. Whether a defendant's statements amount to an unequivocal or equivocal invocation, or no invocation at all, is a question of law. *Id.* To determine "whether a defendant's words constituted an unequivocal invocation of the right against self-incrimination under Article I, section 12, a reviewing court must consider those words, in the context of the totality of the circumstances existing at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right." *Id.* at 613.

However, what happened during a custodial interrogation, including what a defendant did or did not say, is a question of fact. *Id.* at 609. Moreover, the totality of the circumstances includes tone, inflection, any gestures that preceded or accompanied the defendant's statement, and the tenor of the conversation that preceded it, which are also questions of fact for the trial court. *Id.* at 621 (Kistler, J., concurring). We are bound by the trial court's findings of fact that are supported by evidence in the record. *Id.* at 609.

In light of the applicable legal framework, we examine defendant's interrogation in detail. At the start, Voss and Garrett administered *Miranda* warnings before informing defendant that the victim had alleged that he had sexually abused her and that he had taken sexually explicit video and photographs of her with his cell phone. During the first hour of the interview, defendant repeatedly denied that his cell phone contained any such images. He explained that the victim had threatened to make abuse allegations against him to "get rid of" him and was upset with him because he had disciplined her. After about 30 minutes, Garrett accused defendant of lying and told him that the detectives had seen explicit video and photographs of the victim from his cell phone. Defendant continued to deny that he had done anything wrong or that there was anything incriminating on his phone. Garrett continued to question defendant, urging

him to take responsibility for his actions. Defendant continued to deny any wrongdoing. After nearly an hour of questioning, the detectives gave defendant a break to smoke a cigarette.

When they returned from the break, the detectives immediately confronted defendant with prints of some of the less explicit photos that they had discovered on his phone.[2] Specifically, Voss showed him three photographs. The first was an inoffensive photograph of defendant and the victim. The second and third photographs were pictures "aimed downwards towards the pubic area of what appears to be a girl."

Voss informed defendant that "these were taken within a couple minutes of each other." Defendant sat in silence. Voss, while pointing at the first photograph, stated, "That's [the victim]; that's you." After almost 20 seconds of silence, Garrett asked, "Where's that at?" Defendant responded, "At her mom's house, I think." Voss asked, "That's not your bedroom at the Oxford House?" Defendant responded, "No." Forty-five seconds of silence followed, after which Garrett pressed defendant about the timing of the photographs. The detectives and defendant sat in silence for over one minute. Voss then stated, "Tell me what you are thinking, man." Defendant responded, "I'm not." Voss asked, "You're not thinking?" Defendant shook his head no. Garrett then interjected, "Tell me, does that make sense?" Defendant said, "It's there." Garrett responded, "So why don't you start telling us why it's there." At that point, defendant said, "I don't have nothing to say."

After defendant made that statement, the detectives showed him additional incriminating photos and told him that there was an explicit video with his voice "in the back." Shortly thereafter, defendant made the incriminating statements whose admission is challenged on appeal.

At the pretrial suppression hearing, the trial court viewed a video recording of the interrogation and heard

---

[2] Expert testimony at defendant's trial established that the photographs and videos had been deleted from defendant's phone. The police were able to recover some of the photographs and videos in whole, and parts of others.

testimony from Voss and Garrett. The court concluded that defendant's statement, "I don't have nothing to say," was not an equivocal invocation of his right against compelled self-incrimination. The court explained,

> "[T]hat statement is just a very literal statement that he didn't have anything that he could report; that he had no information. He is not—he is describing, consistent with his earlier statement, that he is not thinking there is nothing for him to communicate. 'I don't think I should speak now or anything like that.' It is 'I have nothing going on in my mind.'
>
> "I will find that the defendant was surprised at that moment, surprised at the existence of the photographs at that moment and was taken aback in the moment and had no response that he could formulate in the moment. So I don't view that initial conversation, that initial so-called potential invocation, as an equivocal statement. I view it as a literal statement.
>
> "I don't think, having observed it on the video, that it can be interpreted differently. You watch him. He takes that long pause. It is as though his breath is taken away. I don't have anything to say."

The trial court also made findings that the detectives were "polite in all respects" and "were not trying to intimidate or command a response" from defendant.

On appeal, defendant contends that a reasonable officer would have understood "I don't have nothing to say" as an expression of defendant's desire to remain silent. In support, defendant points to other cases in which similar statements were determined to be equivocal invocations. Defendant also asserts that he spoke freely with the detectives until he was confronted with the incriminating photographs, which, in defendant's view, demonstrates that he wished to remain silent when he stated, "I don't have nothing to say," because he realized the seriousness of the situation and knew that he "had better keep quiet."

The state counters that it is not merely the ordinary meaning of the words in a particular statement that determine whether a suspect has invoked a right under Article I, section 12, but rather those words must be evaluated in light

of the totality of the circumstances of that particular case. The state argues that, here, when defendant's statement is placed in the context of the conversation that immediately preceded it, it is clear that defendant was merely responding to a particular question—that is, he was merely stating that he could not explain how the incriminating photographs came to be on his cell phone. Moreover, the state contends that the trial court's additional factual findings— that defendant was "surprised," "taken aback," and had his "breath taken away"—support the court's conclusion that a reasonable officer would not have understood defendant to be invoking his right against compelled self-incrimination. In the state's view, a reasonable officer would have understood defendant to be communicating that he was speechless and had no way to explain the photographs with which he had just been confronted.

As explained below, defendant's statement, when viewed in the context in which it was made and in light of the trial court's factual findings that defendant was "surprised" and "taken aback" that the detectives had possession of incriminating photographs, was neither an unequivocal nor equivocal invocation of his right against compelled self-incrimination.

We begin with the context of the statement. As noted, very early in the interview, the detectives confronted defendant with the victim's allegation that he had taken photographs and video of the criminal acts with his cell phone. Defendant denied the allegations, explaining that the victim was trying to "get rid of" him. Defendant continued to deny the existence of any photographs on his cell phone even when faced with the detectives' assertions that they had seen explicit photographs and video from his phone. Then, after a break, the detectives confronted him with some of the photographs that defendant had insisted did not exist. At that moment, defendant appeared, as the trial court found, to be "surprised" and "taken aback" that the detectives had in their possession those photographs. *See Avila-Nava*, 356 Or at 621 (Kistler, J., concurring) (noting that issues of historical fact for the trial court like physical movements, tone and inflection, and tenor of conversation provide clues to the meaning of a defendant's words). In the conversation that

followed, defendant twice indicated to Voss that he was "not thinking." That is, Voss specifically asked defendant to "tell me what you are thinking," to which defendant responded "I'm not." When Voss asked, "You're not thinking?" defendant shook his head no. Garrett's follow up question, "So why don't you start telling us why it's there?" elicited defendant's response, "I don't have nothing to say."

When defendant's state of shock is considered in the context of the entirety of the interrogation up to that point and the line of questioning immediately preceding defendant's statement, the trial court correctly concluded that a reasonable officer would not have understood defendant to be invoking his right under Article I, section 12. That is, given that defendant was visibly "taken aback" that the detectives had possession of incriminating photographs whose existence he had just spent an hour denying, and that he twice indicated to the detectives that he was not "thinking," a reasonable officer would have understood his statement, "I don't have nothing to say," in those circumstances as a statement that he could not explain the presence of the photographs, not as a statement that he no longer wanted to talk to the detectives. The trial court correctly concluded that a reasonable officer would have understood defendant's statement as indicating literally that he could not formulate an explanation as to the photographs in the detectives' possession.

The cases on which defendant relies as instances in which similar statements led to the conclusion that a defendant had invoked his Article I, section 12, right are inapposite. Those cases involve different circumstances and occurred in contexts different than in this case. The case law is clear that context must be considered in deciphering the meaning of a suspect's words—even where the suspect's words in isolation may appear to be an invocation of the right against compelled self-incrimination. *See, e.g., State v. Smith*, 310 Or 1, 10, 791 P2d 836 (1990) (a defendant's statement, "I have nothing to say," was not an invocation of his Article I, section 12, right against compelled self-incrimination because, in the context in which the remark was made, the court correctly concluded that the defendant had merely exercised his right to answer some questions and not to answer others).

## EVIDENCE OF PRIOR FALSE
## ACCUSATIONS OF SEXUAL ABUSE

Before trial, defendant moved to impeach the victim's credibility by introducing evidence that the victim had made a false allegation of sexual abuse against her stepbrother. Defendant sought to use the evidence to show that, because the victim had made false accusations previously, her accusations against defendant likewise were false. At a pretrial hearing on the motion, the court concluded that defendant's evidence that the victim had falsely accused her stepbrother was too speculative—defendant presented evidence only that the victim had made an allegation and that the resulting investigation was inconclusive. Therefore, the court concluded that the limited probative value of defendant's proposed evidence was substantially outweighed by the potential for prejudice. The court, however, granted defendant leave to revisit the issue at trial and to explore further whether any of the state's witnesses could explain why the investigation had been inconclusive.

At trial, outside the jury's presence, defendant elicited testimony from the victim's mother and grandmother about the victim's prior accusations. The victim's grandmother, in an offer of proof, testified that she "understood" that the disposition of the victim's allegations was unfounded, and that "several years ago" the victim had told her that her stepbrother "didn't inappropriately do anything." When pressed, grandmother further explained that she "tried to not question her much" because the victim's counselor "told us that it was best if we didn't." The victim's mother testified that all she knew about the accusation was that she was told "there wasn't enough evidence to carry anything out."

At the conclusion of defendant's offer of proof, the court stood by its earlier ruling from the pretrial hearing and excluded the evidence of the victim's accusation against her stepbrother. The court noted that "there is no evidence that confirms that * * * there was a false accusation made. There is none of that, nor is there any evidence to confirm that the incident of abuse even happened that is competent." Accordingly, the court concluded that the evidence "is not admissible for the reasons I outlined at the earlier hearing."

The legal framework for defendant's second assignment of error is set forth in *State v. LeClair*, 83 Or App 121, 730 P2d 609 (1986), *rev den*, 303 Or 74 (1987). In that case, the defendant, who was charged with sex crimes related to his abuse of a seven-year-old victim, sought to introduce evidence that the victim had previously made false accusations of sexual abuse. *Id.* at 123. The trial court concluded that the evidence was not admissible and forbade defendant from cross-examining the victim about the incidents. *Id.* at 125.

On appeal, we concluded that "[e]vidence of previous *false accusations* by an alleged victim is not evidence of *past sexual behavior* within the meaning of the Rape Shield Law and, therefore, is not inadmissible under OEC 412." *Id.* at 126-27 (emphases in original). On the other hand, we noted that OEC 608(2)[3] "forbids any inquiry or cross-examination into specific incidents of conduct for impeachment purposes," and that "[s]pecific instances of conduct include false statements." *Id.* at 127. We further noted that the Confrontation Clause of Article I, section 11, of the Oregon Constitution allows a defendant to impeach a witness on cross-examination, though a defendant's confrontation right is not absolute. We explained that "a court may prohibit cross-examination for impeachment purposes when the probative value of the evidence that the defendant seeks to elicit is *substantially* outweighed by the risk of prejudice, confusion, embarrassment or delay." *Id.* at 129 (emphasis in original).

Accordingly, in *LeClair* we held that, as to evidence of prior false accusations of sexual abuse,

"regardless of the prohibitions of OEC 608, the Confrontation Clause of Article I, section 11, requires that the court permit a defendant to cross-examine the complaining witness in front of the jury concerning other accusations she has made if 1) she has recanted them; 2) the defendant demonstrates to the court that those accusations were false; or

---

[3] OEC 608(2) provides:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in [OEC 609], may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

3) there is some evidence that the victim has made prior accusations that were false, unless the probative value of the evidence which the defendant seeks to elicit on the cross-examination (including the probability that false accusations were in fact made) is substantially outweighed by the risk of prejudice, confusion, embarrassment or delay."

*Id.* at 130. Ultimately, we concluded that the trial court did not err by excluding the evidence of false accusations because, analyzing the case under those three categories, (1) the complaining witness had not recanted, (2) the defendant had not demonstrated to the court that the victim made other accusations that were false, and (3) although there was *some* evidence from which the court could find that the victim had made a false accusation, the court properly had engaged in balancing and decided the probative value was low and outweighed by the risk of delay and jury confusion. *Id.* at 130-31.

Here, defendant raises arguments related to only *LeClair's* first and third categories. As to the first category, he asserts that grandmother's testimony established that the victim had recanted her accusations, because she told grandmother that the stepbrother did not do anything inappropriate. In the alternative, as to the third *LeClair* category, defendant contends that there was at least *some* evidence that the victim had made prior false accusations, and that the trial court failed to balance the probative value of the evidence against the risk of prejudice, delay, or jury confusion. In defendant's view, the trial court's failure to conduct the required balancing is reversible error because the error was not harmless.

We review defendant's argument under *LeClair's* first category—that the evidence established that the victim recanted—to determine whether the record supports the trial court's finding that the victim did not recant. The court's finding on that point is binding on appeal if the record supports it. *State v. Taylor*, 275 Or App 962, 965, 365 P3d 1149 (2015); *see State v. Arellano*, 149 Or App 86, 90, 941 P2d 1089 (1997), *rev dismissed as improvidently allowed*, 327 Or 555 (1998) (under *LeClair*, we are bound by the trial court's finding that an accusation was not recanted if there is evidence to support that finding).

The record supports the trial court's finding that the victim did not recant her accusation. As the state points out, and as the trial court concluded, grandmother's testimony about the victim's prior accusations was equivocal. Although she remembered the victim stating that her stepbrother did nothing inappropriate, the details of that memory were vague, and she admitted that, based on the advice of the victim's counselor, she did not press the victim on the subject. Accordingly, the record supported the trial court's finding that the victim had not recanted. *See State v. Wonderling*, 104 Or App 204, 208, 799 P2d 1135 (1990) ("'Recantation' means the unequivocal public withdrawal of an allegation.").

As for defendant's other argument, under the third *LeClair* category, we generally review the court's decision to admit or exclude the evidence for an abuse of discretion. *Arellano*, 149 Or App at 90. However, on appeal, defendant's only argument appears to be that the trial court failed to engage in the balancing required by *LeClair*. We disagree.

At the pretrial hearing, after defendant admitted that the only evidence he then had regarding the victim's accusations against her stepbrother were that they were made and had not led to prosecution, the court concluded that the evidence would invite speculation and "[s]o the probative value is substantially outweighed by the prejudicial effect in this context." After defendant's offer of proof, during which he elicited additional evidence about the accusations, the court ruled that there was no evidence that confirmed that the victim had made a false accusation, nor did any evidence confirm that the abuse had actually happened. Given that conclusion, the court declined to admit it "for the reasons that I outlined at the earlier hearing." In that context, it is clear that the trial court concluded that nothing in the offer of proof had altered its conclusion that the probative value of the victim's prior accusations against her stepbrother was substantially outweighed by the potential for prejudice. And to the extent that defendant is arguing that that decision was an abuse of discretion, we disagree. *See Arellano*, 149 Or App at 91 (where evidence was in conflict and trial court found it confusing, trial court acted within its discretion in excluding evidence of the victim's prior accusation).

## COURT-APPOINTED ATTORNEY FEES

Finally, we address defendant's third assignment of error. In that assignment, defendant contends that the trial court committed plain error when it ordered him to pay $16,000 in attorney fees when the record was silent as to whether he "is or may be able to pay" the costs of his defense and he was sentenced to 600 months' imprisonment. *See* ORS 151.505(3) ("The court may not require a person to pay costs under this section unless the person is or may be able to pay the costs."); ORS 161.665(4) ("The court may not sentence a defendant to pay costs under this section unless the defendant is or may be able to pay them."). Defendant failed to preserve that claim of error but urges us to review and correct the error as "an error of law apparent on the record." ORAP 5.45(1); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (describing "plain error" review). The state concedes that the trial court committed plain error when it incorrectly imposed attorney fees on this record.

We accept the state's concession that the trial court plainly erred in imposing attorney fees of $16,000 on this record. *See State v. Coverstone*, 260 Or App 714, 716, 320 P3d 670 (2014) (holding that a trial court commits plain error by imposing court-appointed attorney fees where the record is silent as to the defendant's ability to pay the fees ordered). Further, we conclude that, for reasons similar to those expressed in *Coverstone*, it is appropriate to exercise our discretion to correct the error. *Id.* at 716-17.

Portion of judgment requiring defendant to pay attorney fees reversed; otherwise affirmed.