ORTEGA, P. J.
*100 In light of State v. Nichols , 361 Or. 101, 390 P.3d 1001 (2017), the Supreme Court vacated our decision, State v. Rose , 278 Or. App. 551, 377 P.3d 613 (2016) ( Rose I ), and remanded the case for reconsideration. State v. Rose , 361 Or. 524, 395 P.3d 874 (2017) ( Rose II ). In Rose I , we concluded that defendant's statement-"I don't have nothing to say"-was not an invocation of his right to remain silent under Article I, section 12, of the Oregon Constitution and that the trial court did not err when it denied, in part, defendant's motion to suppress incriminating statements that he made during a custodial interview. On remand, reviewing for legal error, State v. Avila-Nava , 356 Or. 600, 609, 341 P.3d 714 (2014), we conclude that defendant's statement was an equivocal invocation of that right, and the detectives failed to further clarify defendant's intent. Consequently, we reverse and remand.
We begin with the facts, consistent with the trial court's findings of fact that are supported by evidence in the record. Id . Nine-year-old E reported that defendant-her mother's boyfriend-sexually abused her and recorded on his cell phone sexually explicit photographs and video of her. Detectives Voss and Garrett arrested defendant and, having seized defendant's phone, interrogated him at the police station. The details of the interrogation, taken from Rose I , are as follows:
"At the start, Voss and Garrett administered Miranda warnings before informing defendant that the victim had alleged that he had sexually abused her and that he had taken sexually explicit video and photographs of her with his cell phone. During the first hour of the interview, defendant repeatedly denied that his cell phone contained any such images. He explained that the victim had threatened to make abuse allegations against him to 'get rid of' him and was upset with him because he had disciplined her. After about 30 minutes, Garrett accused defendant of lying and told him that the detectives had seen explicit video and photographs of the victim from his cell phone. Defendant continued to deny that he had done anything wrong or that there was anything incriminating on his phone. Garrett continued to question defendant, urging him to take *101 responsibility for his actions. Defendant continued to deny any wrongdoing. After nearly an hour of questioning, the detectives gave defendant a break to smoke a cigarette.
"When they returned from the break, the detectives immediately confronted defendant with prints of some of the less explicit photos that they had discovered on his phone. Specifically, Voss showed him three photographs. The first was an inoffensive photograph of defendant and the victim. The second and third photographs were pictures 'aimed downwards towards the pubic area of what appears to be a girl.'
"Voss informed defendant that 'these were taken within a couple minutes of each other.' Defendant sat in silence. Voss, while pointing at the first photograph, stated, 'That's [the victim]; that's you.' After almost 20 seconds of silence, Garrett asked, 'Where's that at?' Defendant responded, 'At her mom's house, I think.' Voss asked, 'That's not your bedroom at *1146 the Oxford House?' Defendant responded, 'No.' Forty-five seconds of silence followed, after which Garrett pressed defendant about the timing of the photographs. The detectives and defendant sat in silence for over one minute. Voss then stated, 'Tell me what you are thinking, man.' Defendant responded, 'I'm not.' Voss asked, 'You're not thinking?' Defendant shook his head no. Garrett then interjected, 'Tell me, does that make sense?' Defendant said, 'It's there.' Garrett responded, 'So why don't you start telling us why it's there.' At that point, defendant said, 'I don't have nothing to say.'
"After defendant made that statement, the detectives showed him additional incriminating photos and told him that there was an explicit video with his voice 'in the back.' Shortly thereafter, defendant made the incriminating statements whose admission is challenged on appeal."
278 Or. App. at 555-56, 377 P.3d 613 (footnote omitted). In addition to those facts, we mention that the trial court viewed a visual recording of the interview and expressly found that, after the detectives had confronted defendant with the existence of the photographs, he was "surprised" and "taken aback," and that defendant reacted by taking a "long pause," as "though his breath [was] taken away."
Defendant moved to suppress incriminating statements that he made during the custodial interview, arguing *102 that his statement, "I don't have nothing to say," was either an unequivocal or equivocal invocation of his right to remain silent. Later in the interview, defendant also said, "I really don't want to talk about it," and the trial court agreed with defendant that that was an equivocal invocation and, therefore, suppressed incriminating statements made thereafter, but the court determined that "I don't have nothing to say" could only be viewed as a "literal statement." That is, the court concluded that defendant "had no response that he could formulate in the moment" and "no information" to share with the detectives, or that defendant had "nothing going on in [his] mind." Thus, the court decided that defendant's statement was not an invocation of his right not to talk to the detectives and, accordingly, it did not suppress the statements made after defendant said, "I don't have nothing to say." After a jury trial, defendant was convicted of 13 sex crimes.
Defendant appealed and asserted three assignments of error. The one that is the sole focus of this opinion challenged the trial court's conclusion that the statement, "I don't have nothing to say," was neither an unequivocal nor equivocal invocation of his right against self-incrimination.[1] In our original decision, in which we agreed with the trial court's conclusion that defendant's statement, "I don't have nothing to say," was not an invocation, we began our analysis with the context in which defendant's statement was communicated. Instrumental in our decision affirming the trial court's conclusion that defendant could not formulate an explanation for the photographs was the fact that defendant was "surprised" and "taken aback." Avila-Nava , 356 Or. at 621, 341 P.3d 714 (Kistler, J., concurring) (explaining that the totality of the circumstances includes tone, inflection, any gestures that preceded or accompanied the defendant's statement, and the tenor of the conversation that preceded it). Because defendant was visibly "taken aback," we explained, when he learned that the detectives had possession of incriminating *103 photographs whose existence he had just spent an hour denying, and given that he twice indicated to the detectives that he was not "thinking," the words at issue indicated that he could not explain the presence of the photographs. We therefore agreed with the trial court's conclusion that a reasonable officer in this context would not have understood defendant's words as a statement that he no longer wanted to talk to the detectives. *1147 Our approach in Rose I -beginning with and emphasizing the context of the circumstances surrounding the statement at issue-was different from the approach taken in Nichols , in which the Supreme Court began its analysis with the "words that defendant identifies as having amounted to an unequivocal invocation" and "viewed [them] in isolation" before it examined the context in which the statements were made. 361 Or. at 109, 390 P.3d 1001. Before we further explain that approach and the facts and analysis in Nichols necessary to address this remand, we pause to explain the familiar principles of the Article I, section 12, right against self-incrimination and invocations of that right. Article I, section 12, provides a right against self-incrimination.[2] That right is protected by the requirement that the police must stop their custodial interrogation of a criminal suspect when the suspect invokes the right unequivocally. Avila-Nava , 356 Or. at 602, 341 P.3d 714. When the right is invoked equivocally, "the police must ask follow-up questions to clarify what the suspect meant before proceeding with the interrogation." Rose I , 278 Or. App. at 555, 377 P.3d 613 (citing Avila-Nava , 356 Or. at 609, 341 P.3d 714 ); see also State v. Sanelle , 287 Or. App. 611, 620, 404 P.3d 992 (2017) ("[T]hat clarifying questions must be asked if there is an equivocal invocation" is a "familiar principle.").
As noted, "[w]hether a defendant's statements amount to an unequivocal or equivocal invocation, or no invocation at all, is a question of law." Rose I , 278 Or. App. at 555, 377 P.3d 613 (citing Avila-Nava , 356 Or. at 609, 341 P.3d 714 ). In answering that legal question, a court must consider a defendant's words " 'in the context of the totality of the circumstances existing *104 at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right.' " Id . (quoting Avila-Nava , 356 Or. at 613, 341 P.3d 714 ). "However, what happened during a custodial interrogation, including what a defendant did or did not say, is a question of fact." Id . (citing Avila-Nava , 356 Or. at 609, 341 P.3d 714 ). "Moreover, the totality of the circumstances includes tone, inflection, any gestures that preceded or accompanied the defendant's statement, and the tenor of the conversation that preceded it, which are also questions of fact for the trial court." Id . (citing Avila-Nava , 356 Or. at 621, 341 P.3d 714 (Kistler, J., concurring)).
Turning to Nichols , the statement that the Supreme Court viewed as an unequivocal invocation was "It's not something I want to talk about," which the defendant stated in response to the interviewing detective directly asking the defendant to tell him about the circumstances behind the death of his girlfriend, who had fallen to her death while hiking with the defendant several years before the interview took place. 361 Or. at 102-04, 390 P.3d 1001. That was the precise subject of the investigation for which the defendant was being interviewed, and the defendant made the statement early on in the interview. Id. at 111-12, 390 P.3d 1001.
As noted, the court first examined the words-in isolation-of the defendant's statement. Id . at 109, 390 P.3d 1001. When so examined, the court deemed the statement ambiguous. Id . That is, a "reasonable officer could have understood that defendant was invoking his right under Article I, section 12, or, alternatively, that defendant was expressing a desire to not discuss, or at least a reluctance to discuss, the circumstances of the victim's death." Id . ; see also id. at 110, 390 P.3d 1001 ("[D]efendant's words, standing alone, could have been understood by a reasonable officer to be an unequivocal invocation or, alternatively, as an equivocal invocation or a reluctance to discuss an emotionally charged topic."). The court noted that, "[o]f course, particular or precise wording is not required to invoke the right in question." Id. at 110, 390 P.3d 1001. Therefore, even though the defendant's statement on its face "did not directly convey *** an intention on defendant's part to take the affirmative action of either invoking his right *105 against compelled self-incrimination under Article I, section 12, or expressing the desire to do so[,] *** defendant's statement plausibly could be construed more than one way." Id . *1148 Having concluded that the words were ambiguous, the court then proceeded to look at the context in which the statement was made. The court viewed as significant two aspects of the context. First, the defendant made his statement "in response to [the detective's] request that defendant tell him about 'the circumstances behind [the victim's] death.' " Id . at 111, 390 P.3d 1001 (first brackets added; second brackets in original). Further, "the topic about which defendant unambiguously expressed a desire to not speak to the detectives went to the core of the entire investigation and the crime for which he had been arrested." Id . Second, the statement was made early in the interview, thus distinguishing the circumstances of the defendant's statements from those circumstances the state pointed to in two other cases decided by the court, State v. Kell , 303 Or. 89, 734 P.2d 334 (1987), and State v. Smith , 310 Or. 1, 791 P.2d 836 (1990), in which the defendants had fully participated in the investigatory interviews by the time they made their purported invocations. Nichols , 361 Or. at 111-12, 390 P.3d 1001.
With that said, in this case we begin with and view in isolation the words that defendant spoke-"I don't have nothing to say." We readily conclude that those words are capable of the meaning ascribed to them by the trial court-that is, they amount to a "literal statement" that defendant had "no information" to give to the detectives or that he "had no response that he could formulate in the moment." However, viewed in isolation, the words "I don't have nothing to say" are also capable of meaning that defendant had no desire to discuss or a reluctance to discuss with the detectives the photographs they had just shown him. See id. at 109, 390 P.3d 1001 (It was plausible that "defendant was expressing a desire not to discuss, or at least a reluctance to discuss, the circumstances of the victim's death."). To conclude otherwise would require ignoring a colloquial understanding of that phrase, or similar phrases, where "I don't have anything to say" means "I don't have anything to say to you ," or "I don't want to answer you." Although defendant's statement did *106 not include an explicit expression of reluctance or a desire to invoke his Article I, section 12, right, such as indicating that he "wants" to invoke the right or that he "won't" speak to the detectives, defendant was not required to precisely and literally articulate his right to invoke his Article I, section 12, right. Id. at 110, 390 P.3d 1001 (noting that "particular or precise wording is not required to invoke the right in question").
Given that defendant's words can plausibly be interpreted, viewed in isolation, as an invocation, the relevant question becomes whether the circumstances and context preceding and at the time of the statement inevitably compel the conclusion that the statement cannot have been understood as an invocation. In other words, the question is whether, given the totality of the circumstances, a reasonable officer could only view the statement as something other than an invocation.
In Rose I , we reasoned that (1) because defendant had twice indicated that he was not "thinking" when the detectives asked him what he was thinking and before the detectives urged, "So why don't you start telling us why it's there?" and (2) because defendant was "taken aback" and "surprised," a "reasonable officer would have understood defendant's statement as indicating literally that he could not formulate an explanation as to the photographs in the detectives' possession." 278 Or. App. at 558-59, 377 P.3d 613. That is, like the trial court, we concluded that the literal meaning of defendant's statement was the only plausible meaning, or, put differently, that no reasonable officer could understand defendant's statement as expressing anything other than that literal meaning. Thus, by that reasoning, defendant's statement was not an equivocal invocation (much less an unequivocal one).
It is true that defendant twice answered that he was not thinking anything in response to the detectives asking what he was thinking-"Tell me what you are thinking, man" and "You're not thinking?"-and responding, respectively, "I'm not" and shaking his head no. Those answers, however, directly addressed the questions as framed by the detectives. And, although the answers may be interpreted literally, they can also be understood as a *107 wish not to respond to the detectives in the way they had framed the inquiry. Moreover, defendant's statement was a response to a different tack taken by *1149 the detectives. After asking defendant, "Tell me, does that make sense?" the detectives then suggested, "So why don't you start telling us why [the photograph is] there." (Emphasis added.) That is when defendant answered, "I don't have nothing to say." Rather than trying to elicit defendant's "thinking" about the photographs, the detectives shifted to a more direct attempt to get him to tell them why the photographs were on his phone. Defendant's response, "I don't have nothing to say," can plausibly be understood as a wish not to tell the detectives anything about the photographs, evidence that went to the core of the investigation. To be sure, defendant's previous answers are consistent with the trial court's conclusion that he was unable to formulate an answer in that moment, but it does not necessarily follow that the previous answers compel a conclusion that the only plausible interpretation of the statement at issue is that defendant could not formulate an answer, and, thus, that there was not an invocation.
That defendant was "taken aback" and looked "surprised" when confronted with the photographs does not obviate a conclusion that he was expressing a desire not to discuss them with the detectives or a reluctance to do so. Those reactions support a plausible interpretation that defendant was so surprised when shown the photographs that he could not come up with an answer in that moment-but the fact of surprise is not necessarily inconsistent with viewing his statement as an invocation. That is because about two minutes elapsed between the moment the detectives confronted defendant with the photographs and he "appeared 'surprised' and 'taken aback' " and when defendant made the statement at issue. Id . at 558, 377 P.3d 613. That amount of time was sufficient for defendant to regain enough composure and recover from the surprise to support the other plausible meaning of "I don't have nothing to say" as an invocation of his right to remain silent. Thus, even when the totality of the circumstances, including tone and inflection, are considered, a reasonable officer could have viewed defendant's statement as an invocation. See State v. Roberts , 291 Or. App. 124, 132, 418 P.3d 41 (2018) ("An invocation is equivocal * * * when the suspect's *108 statement or request is subject to more than one reasonable interpretation, one of which is that he or she is invoking the right [at issue].").
We therefore conclude that neither defendant's statements preceding the question and response at issue nor defendant's surprise when confronted with the photographs negate a reasonable interpretation of defendant's statement-"I don't have nothing to say"-as an invocation. Stated differently, although a reasonable officer could have interpreted defendant's statement as indicating that he could not formulate a response, a reasonable officer could alternatively have interpreted defendant's statements as an invocation, thus requiring clarifying questions to discern his intent. Accordingly, based on the foregoing, defendant's statement-"I don't have nothing to say"-was an equivocal invocation of his right to remain silent. Our reasoning also leads us to conclude that the statement was not an unequivocal invocation: The words of the statement were capable of meaning something other than an invocation-that defendant could not formulate a response-and the circumstances surrounding the statement could be viewed as consistent with those words. Accordingly, because the detectives failed to clarify defendant's statement before proceeding further, the trial court erred in not suppressing the statements made after defendant's equivocal invocation.
Reversed and remanded.

Only that assignment relates to Nichols . The other two were that the trial court erred "in excluding evidence that the victim had made prior false accusations of sexual abuse against [the victim's] stepbrother," and "when it ordered [defendant] to pay $ 16,000 in court-appointed attorney fees in the absence of evidence that he had the 'ability to pay.' " Rose I , 278 Or. App. at 553, 377 P.3d 613.

Article I, section 12, of the Oregon Constitution provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself."