No. 177 March 11, 2026 581

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUSTIN DAVID BURGESS,
*Defendant-Appellant.*

Marion County Circuit Court
23CR29005; A183361

J. Channing Bennett, Judge.

Submitted November 13, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Laura A. Frikert, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

EGAN, J.

Convictions on Counts 1 and 2 reversed and remanded; remanded for resentencing; otherwise affirmed.

**EGAN, J.**

In this criminal appeal, defendant seeks the reversal of his two convictions for first-degree burglary, ORS 164.225, assigning error to the denial of his motion to suppress statements made to police during in-custody interrogation.[1] He makes two alternative arguments that would provide an identical suppression remedy: (1) that he unequivocally or equivocally invoked his right against self-incrimination and sheriff's deputies failed to properly honor or clarify that invocation, and (2) that his statements were not voluntary. Because we agree that, at minimum, defendant equivocally invoked his right against self-incrimination and that deputies improperly failed to either clarify that equivocal invocation or cease questioning altogether, we need not reach defendant's second argument. We reverse defendant's burglary convictions and remand for further proceedings; we affirm his unchallenged conviction for unauthorized use of a vehicle.

## I.   STANDARD OF REVIEW

When evaluating a trial court's suppression ruling, "[w]e defer to the factual findings of the trial court—including as to what transpired during a custodial interrogation and what a defendant did or did not say." *State v. Hadd*, 323 Or App 691, 701, 523 P3d 1123, *rev den*, 371 Or 21 (2023). But "[w]hether a defendant's statement was an invocation and, if an invocation, whether it was equivocal or unequivocal are questions of law." *Id.* at 705.

## II.   SUMMARY OF EVIDENCE

In June of 2023, deputy sheriffs arrested defendant after he fled from them in a stolen Suburban SUV. Thereafter, he was placed in an interview room, where he spent the next eleven hours. During that time, deputies sporadically questioned him about three crimes under investigation: the theft of a trailer, the theft of the Suburban (which, defendant later admitted, involved a burglary to obtain the owner's keys), and a burglary involving the theft of firearms

---

[1] Defendant was also convicted of unauthorized use of a vehicle, ORS 164.135, but he does not seek the reversal of that conviction on appeal.

(the firearm burglary).[2] Taken together, the questioning itself lasted for about two hours.

Very early on, defendant confessed to stealing the trailer and the Suburban, but he did not admit to entering the house of the Suburban's owner to take the keys and seemed particularly reluctant to even mention the firearm burglary. The focus of this appeal is on a statement that defendant made in the middle of his 11-hour stay in the interview room and in response to questions about the firearm burglary: "I don't think it's smart for me to talk anymore. It's not going to help me. My fucking family is going to get off'd." The question is whether that statement amounted to at least an equivocal invocation of his right against self-incrimination.

To answer that question, we must evaluate that statement in the context that it was made in, *id.* at 705-06, and therefore, we summarize the interrogation leading up to it in some detail. The entirety of defendant's stay in the interview room was recorded on video, and that video was admitted as evidence at the suppression hearing. The following facts are largely taken from that recording.

Very soon after defendant arrived in the interrogation room, two deputies released him from handcuffs and provided *Miranda* warnings, which defendant said he understood. The deputies then questioned him about the stolen trailer. Defendant admitted that he had stolen it. Next, the deputies asked him how he had gotten the Suburban, and defendant admitted that he stole it about a week before from the driveway of his friend's father's house using a key that he already had. He denied entering the owner's house.

A little less than two hours after that, Sergeant Garret Olson, who had grown up with defendant and had a positive relationship with him, started questioning defendant. Defendant again admitted to stealing the Suburban. Olson asked him if there was anything else that happened in the last few days that he wanted to admit to (it is clear that Olson was seeking information about the firearm burglary

---

[2] The two burglary convictions that defendant challenges on appeal relate to the burglary of the Suburban's keys from the owner's house (Count 2) and the firearm burglary (Count 1).

but did not say so at the time). Defendant replied only that he was trying to leave the state so he could start over.

Olson told defendant that they were investigating quite a few things and asked if there was any reason that defendant's DNA would show up as involved in any other crimes in recent days. Defendant said no, other than perhaps the theft of the trailer he had previously admitted to. Olson asked whether, aside from the trailer and Suburban thefts, he had been involved in anything else the previous week. Defendant said, "No."

Olson told defendant that "honesty is your best play in this whole thing, okay. This isn't just about what happened tonight. That's not the reason that I authorized them to chase you in that car. There's more going on than just the trailer and the car." But defendant replied, "I have no idea what you're getting at." After a period of silence, defendant added that there was a .22 pistol and some ammunition in the Suburban but that he did not know what else Olson could be referring to. Defendant said he traded with a person named "Dustin" for the pistol and that he did not know whether the pistol was stolen. He also admitted that he knew that he was not supposed to possess a gun.

About five and a half hours into his stay in the interview room came the core interaction at issue on appeal. Olson returned, this time accompanied by Detective Noe Martinez. Olson said, "[T]here is way more that is going on here than what you are telling me. *** So I know that you were involved in something that occurred in the last couple of days, okay. *** There is a gun in the car, okay. How many of the guns in the car are going to be involved in the thing a couple days ago?" It is again clear that Olson was referring to the firearm burglary, which involved the theft of multiple firearms—but that was left unstated. Defendant said the .22 pistol, which he had referred to earlier, had come from a guy named "Tuna." Olson said that he had seen a video and claimed to recognize defendant in it. Olson explained that he knew other people were involved and that he did not think that defendant was the "ringleader." Olson noted the change in defendant's story—*i.e.*, saying that he got it from "Tuna" rather than "Dustin"—and implored defendant to be honest.

Defendant sat silently. Olson continued to press him for honesty and said, "Just tell me what happened." Defendant finally replied, "It is going to put me away for a while." Olson acknowledged that it might but said, "[I]t is going to put you away possibly a lot longer if you continue to lie about all of this stuff. You have an opportunity to be honest and help yourself, and I am trying to give you that opportunity right now." Defendant replied, "I don't know what is going to help me and what is not going to help me, you know?" Olson said that defendant was not helping himself by giving inconsistent stories and said, "I just want the honest answer." Detective Martinez emphasized that the events were recent, so there was a chance they could get the "stuff" back. But again, no one stated what the "stuff" was. No one had yet mentioned explicitly that the conversation they were having was about stolen firearms or a burglary.

After a pause, defendant said, "I don't know who the guy is. He hangs out around that area in the—he got the information from—from a neighbor. All I know is where he lived by and what vehicle he drives is all—is all I know about him, and then the other guy took off on foot with all—all of the stuff." Olson asked him what he meant by "stuff," and defendant replied, "Stuff that came out of it." Olson asked, "Came out of what? You are being honest and I appreciate it, but you can't speak in generalities, okay?"

After 30 seconds of silence, defendant replied, "Either way, I'm fucked so I am not sure how this is—this is going to help me, you know. The State is—they are not going to care either way." Olson responded that "[t]hat is not necessarily true," because the deputies "have the opportunity to get these things back and off the street, and it is a lot safer for me and my guys if that happens." Olson said that he knew defendant did not "want me or any of the people that work for me to get hurt," to which, defendant asked, "What about me and my family?" Olson replied,

> "Well, you know that I can't promise you anything, and I am not going to promise you anything, but we can work with you, and you can help us get this stuff back, and that is the number one thing that you can do. You can try and right some wrongs tonight, but you have got to start by

telling me the full story of what happened and not speak in generalities. So what are we talking about when you say the stuff?"

After hesitating for a few seconds, defendant sighed and replied, "I don't think it is smart for me to talk anymore." Detective Martinez tried to interject, "See, the thing is—." But defendant continued, "It's not going to help me. My fucking family is going to get off'd."

At this point, Martinez replied,

"The whole thing is, [defendant], if you think about it you are kind of in—you are kind of in a good spot right now, because the one person that ended up catching you this morning is a guy who can vouch for you as someone who has known you for 20 years is what he told me. He told me you were a star athlete back in—back in the day. Is that true? That's what he remembers you as, you know."

The deputies then went on to discuss defendant's past as an athlete and Olson's ability to put in a good word for him. Defendant then proceeded to express concerns about the consequences to him and his family if he "rats" on another person. The deputies tried to persuade him that nothing bad happens to "rats," despite frequent claims to the contrary.

Defendant eventually made various statements that were used against him at trial. Among other things, defendant admitted that he participated in the firearm burglary and provided details that led to the discovery of a surveillance video that corroborated his confession. With regard to the burglary connected to the Suburban theft, defendant admitted that he entered his friend's father's house while they were home and stole a key to the Suburban.

At the suppression hearing, Detective Martinez testified that he did not understand defendant's statement— "I don't think it is smart for me to talk anymore. It's not going to help me. My fucking family is going to get off'd"— to be an unequivocal or equivocal invocation of the right against self-incrimination. Instead, he believed defendant was simply "concerned that his family [was] going to get killed."

The trial court denied defendant's motion to suppress, concluding that defendant's statement was neither an unequivocal or equivocal invocation:

"Viewing the totality of the context of the conversations at the time, I don't find that those were equivocal statements at all, and they weren't ambiguous.

"They were consistent with the conversation and the appropriate follow up, or that he was worried that his family or himself would face retribution if he cooperated.

"I can't read anything in that where he was deciding not to talk other than he was scared about talking, and then continued to talk without further—without any pressure from the officers to hey, no, you don't want to stop talking to us now. That just wasn't present, and so I find for all of those reasons the motion to suppress is denied."

On appeal, defendant challenges that ruling, reprising the argument made below, that, at a minimum, he equivocally invoked his right to against self-incrimination and that the deputies unconstitutionally continued their interrogation. The state argues that defendant did not invoke his right against self-incrimination or that, even if he did equivocally invoke, the trial court properly found that the deputies' response to that equivocal invocation clarified defendant's intent. For the following reasons, we conclude that the trial court erred.

## III.   ANALYSIS

Article I, section 12, of the Oregon Constitution protects an individual's right against compelled self-incrimination. *State v. Thomas*, 343 Or App 560, 565, 578 P3d 1275 (2025). That right means that a person has the right to remain silent in the face of police questioning. *Id.* "[I]f a person in custody * * * unequivocally invokes" that right "then police must honor that request and stop questioning." *Id.* (internal quotation marks omitted). If a person in custody "makes an ambiguous or equivocal invocation of their *Miranda* rights, 'the police are required to ask follow-up questions to clarify what the person meant before proceeding with interrogation.'" *Id.* at 565-66 (quoting *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014)). If police fail to

properly respond to an unequivocal or equivocal invocation of those rights, the remedy is suppression. *Id.* at 566.

"An invocation [of rights] is unequivocal when the suspect expresses a clear intent to invoke his or her rights." *State v. Roberts*, 291 Or App 124, 132, 418 P3d 41 (2018). In contrast, an equivocal invocation occurs when the suspect's statement or request "is subject to more than one reasonable interpretation," one of which is that they are invoking their right to silence. *State v. Scott*, 317 Or App 777, 785, 505 P3d 1007 (2022). To determine if there was an invocation, and whether it was equivocal or unequivocal, "we consider a defendant's words in the context of the totality of circumstances existing at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right." *Id.* (internal quotation marks omitted). "The totality of circumstances may include the preceding words spoken by the defendant and the interrogating officer, the demeanor, gestures, and speech patterns of the defendant, the demeanor and tone of the interrogating officer, and the point at which the defendant allegedly invoked the right to remain silent." *Id.* (internal quotation marks omitted).

As a preliminary matter, contrary to the state's alternative argument, we conclude that if defendant did invoke his right against self-incrimination—whether unequivocally or equivocally—the deputies' response was not constitutionally proper. If it was unequivocal, they did not immediately cease questioning as they would be required to do. And if it was equivocal, their response was not constitutionally permissible. Far from clarifying whether defendant was intending to invoke his constitutional right or not, their immediate response was aimed at persuading defendant to continue to answer their questions—telling him, among other things, that he was in an ideal situation because Olson could speak on his behalf and attempting to assuage his concerns about the risks of being a "rat." Therefore, if defendant's statement can be understood as an unequivocal or equivocal invocation, the trial court necessarily erred in denying his motion to suppress. For that reason, we need only decide here whether defendant's statement was at least equivocal.

Unequivocal invocations typically follow a pattern. "[T]he defendant expresse[s] his or her intent by first self-identifying as the actor ('I') and then by clearly stating the desired action or view relating to the right in question (won't answer questions, don't want to talk, need a lawyer)." *State v. Nichols*, 361 Or 101, 110, 390 P3d 1001 (2017). Examples of unequivocal invocations that follow that typical pattern include:

- "I won't answer any questions." *Avila-Nava*, 356 Or at 603, 617.

- "I'm done, I don't want to talk anymore." *State v. McAnulty*, 356 Or 432, 451, 456, 338 P3d 653 (2014), *cert den*, 577 US 829 (2015).

- "I'm done talking." *State v. Schrepfer*, 288 Or App 429, 436, 406 P3d 1098 (2017).

In *Nichols*, the Supreme Court held that, even though the defendant deviated slightly from that specific pattern by using the passive voice, he unequivocally invoked when, in response to a question that went to the heart of the case, he responded, "It's not something I want to talk about." 361 Or at 104, 113.

By contrast, equivocal invocations do not follow a predictable pattern and are more reliant on context. For example, in *State v. Rose*, 296 Or App 99, 100, 437 P3d 1144 (2019), the defendant told officers, "I don't have nothing to say." We acknowledged that that phrase was susceptible to two meanings: (1) that the defendant simply had no answer to the question he was asked, or (2) that he invoked his right to silence. *Id.* at 105. The latter possibility relied on the colloquial understanding of the defendant's statement to mean "I don't have anything to say *to you*," or "I don't want to answer you." *Id.* (emphasis in original). Even though the defendant's statements did not include "an explicit expression of reluctance or a desire to invoke his" constitutional rights, we explained that the "defendant was not required to precisely and literally articulate" his desire to invoke a constitutional right. *Id.* at 106. Instead, the phrase was enough to require officers to clarify the defendant's meaning before proceeding with their interrogation.

In *State v. Harding*, 221 Or App 294, 299, 189 P3d 1259, *rev den*, 345 Or 503 (2008), an officer encountered the defendant, who provided a false name. After being arrested, the defendant gave the officer his real name and then asked why he had been arrested. *Id.* The officer responded that detectives wanted to speak with him. *Id.* The defendant responded, "Man, I thought I had warrants. I don't want to deal with these detectives." *Id.* The trial court had concluded that that statement was not an invocation because, in context, the defendant's statement was reasonably understood only as an explanation for giving a false name—*i.e.,* he gave a false name because he thought he had warrants and did not want to deal with detectives. *Id.* at 301-02. We disagreed that, in context, that was the only reasonable interpretation. *Id.* at 302. Instead, we held that the statement constituted an equivocal invocation because a reasonable officer could also interpret the defendant to mean that he simply did not want to speak with detectives. *Id.*

A final example that is helpful in this case is *State v. Castillo*, 295 Or App 121, 433 P3d 467 (2018), *rev den*, 364 Or 749 (2019). There, the statement was "I'm tired of these interviews. I want to be with my family." *Id.* at 124. Based on context, we held that that statement was *not* an invocation. *Id.* at 131. An officer told the defendant that he seemed oddly devoid of emotion or interest in his child's injuries (which he was under investigation for causing), and the defendant responded, "[A]nybody who knows me will vouch for this, I am very reserved. Am I pissed? Absolutely. Am I sad? Absolutely. I don't know what to do at this point. I'm tired of these interviews. I want to be with my family." *Id.* at 124. In context, we held that those statements could not reasonably be interpreted as an invocation but, rather, as an explanation for his muted demeanor. *Id.* at 129-31. But we noted that, absent the unique context presented, the "defendant's statement that he was tired and wanted to be with his family could be understood as an equivocal invocation of his right to remain silent." *Id.* at 129.

Returning to the present case, we start by looking at defendant's statement in isolation: "I don't think it is smart for me to talk anymore. It's not going to help me.

My fucking family is going to get off'd." On its face, one reasonable interpretation of that statement is that defendant wished to invoke his right to remain silent. As a colloquial matter, "I don't think it is smart for me to talk anymore," can be reasonably understood to mean "I don't want to talk anymore." And, no matter how cooperative defendant had been up to the point of his statement, the use of the word "anymore" is important because it indicates the desire to stop that cooperation going forward. It was not simply that defendant was objecting to one particular question or subject, he was signaling a change in how he wished to respond altogether.

The state argues that defendant's reason for not wanting to talk—*i.e.,* that his "family is going to get off'd"—clarified that defendant was not invoking his right against self-incrimination, he was simply expressing a fear of reprisal. But even assuming that to be a reasonable interpretation of defendant's statement, it does not foreclose the possibility that he was trying to invoke his constitutional right and, therefore, only serves to render the invocation equivocal.

To the extent that the state argues that a person cannot effectively invoke the right against self-incrimination if their wish to cut off questioning is motivated by a fear of reprisal rather than a fear of criminal prosecution, the state presents no authority (and we are aware of none) to suggest that the *reason* or *motivation* behind a defendant's desire to remain silent in the face of interrogation has any bearing on whether or not an invocation has occurred under the Oregon Constitution. Indeed, in *Castillo*, we said that—barring the special circumstances at issue in that case—the statement "I'm tired of these interviews. I want to be with my family" could be an equivocal invocation. 295 Or App at 129. It was immaterial that the defendant's stated motivation for stopping the interrogation was fatigue or wanting to be with family. Certainly, the desire to invoke a constitutional right can be motivated by any number of things, but the legal validity of an invocation should not rise or fall based upon the subjective reason motivating that invocation.[3] Accordingly,

---

[3] It may be that the stated reason for refusing to answer a given question may be highly relevant in deciding whether an invocation was equivocal or unequivocal. For example, a defendant saying, "I don't want to answer any more questions

based on defendant's words alone, he appears, at minimum, to have expressed an equivocal invocation of his right against self-incrimination.

Looking at the broader context of defendant's statement only strengthens that conclusion. Prior to making the statement, defendant had been cooperative and forthcoming about his involvement in the theft of the trailer and the Suburban, but he had refused to explicitly offer much of anything in response to questions about the "something more" that was going on or about the "stuff" that was taken. As the deputies zeroed in on the subject of the firearm burglary and began to press him for information, defendant began to express doubts about whether answering their questions was in his best interest. Defendant questioned whether answering would "help" him because "the state would not care either way." He said things like, "It is going to put me away for a while" and " I don't know what is going to help me and what is not going to help me, you know?" Those hesitations were plainly the byproduct of the higher stakes involved as questioning focused on the firearm burglary.

Defendant's precise statement, "I don't think it is smart for me to talk anymore. It's not going to help me. My fucking family is going to get off'd," came in response to Olson explicitly telling him to identify what he meant by "stuff." That is, it came at a point wherein defendant had to decide whether he was going to disclose what the "stuff" was and, by logical extension, what the "something more going on here" entailed. In that context, "I don't think it is smart for me to talk anymore. It's not going to help me," reasonably could be interpreted to mean that defendant had decided— in answer to his own musing before about what would help him or not—that it would not help him to answer questions "anymore" and, thus, expressed his wish to remain silent.

because I'm starving," is susceptible to two reasonable interpretations—*i.e.*, that the person is invoking their constitutional right because they are hungry or that they simply want to take a break from answering questions to eat a meal. But, again, that would still be an equivocal invocation—at least, absent circumstances establishing that the former interpretation was not a reasonable one in context— and officers would be obligated to clarify the defendant's intent before resuming the interrogation.

It may be that there were other reasonable interpretations of defendant's statement, but that possibility makes it no less of an equivocal invocation. Therefore, we hold that, at minimum, defendant equivocally invoked his right against self-incrimination and that the deputies failed to respond in a constitutionally permissible manner. The trial court erred in denying the motion to suppress.

That leaves only the question of whether the error was harmless. *See State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003) (explaining that we will affirm despite error if the error was harmless). For its part, the state makes no effort to argue that any error would be harmless. Defendant argues that his unlawfully obtained statements, and evidence derived therefrom, constituted "significant" evidence in both of his burglary convictions. We agree. After defendant's invocation, he confessed to entering his friend's father's house to steal the key to the Suburban, and he confessed to participating in the firearm burglary. Although defendant had made multiple other admissions prior to his invocation, he had not admitted to either of those burglaries until after the invocation. The second confession also led to the discovery of corroborative surveillance video. At trial, the state specifically relied on both confessions and the surveillance video in proving and arguing its case to the jury. We cannot say that the admission of such unlawfully obtained evidence was harmless.

Convictions on Counts 1 and 2 reversed and remanded; remanded for resentencing; otherwise affirmed.