No. 10    March 2, 2017    101

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Appellant,*

*v.*

STEVEN P. WAGNER NICHOLS,
*Respondent.*

(CC 140066CR; SC S063985)

En Banc

On appeal from an order of the Hood River County Circuit Court under ORS 138.060(2)(a) and ORAP 12.07.*

Argued and submitted October 13, 2016.

Doug M. Petrina, Assistant Attorney General, Salem, argued the cause and filed the briefs for the petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Anne Fujita Munsey, Deputy Public Defender, Salem, argued the cause and filed the brief for the respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

BALMER, C. J.

The order of the circuit court is affirmed.

_____
    * John A. Olson, Judge.

**BALMER, C. J.**

This case involves the state's appeal of a pretrial order suppressing evidence in a pending murder prosecution, ORS 138.060(2)(a). The trial court determined that, near the beginning of a custodial interrogation, defendant equivocally invoked his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution, but law enforcement failed to clarify defendant's intent as to that invocation and, instead, continued the interrogation. The court concluded that the failure to clarify had violated Article I, section 12, and it therefore suppressed defendant's invocation and all the statements that he had made thereafter. We affirm, but on different grounds: We conclude that defendant unequivocally invoked his right against compelled self-incrimination and, therefore, the interrogation should have ended when defendant made that invocation.

The facts are undisputed.[1] Defendant's girlfriend, who was also the mother of his then-infant daughter, died in 2009 when she fell during a hike with defendant in the Columbia River Gorge. The investigation into the cause of her fall proceeded slowly. In the meantime, defendant continued to live in Oregon for several years; he then traveled with his daughter to work in China, staying for 18 months.

In 2014, while defendant was still in China, prosecutors secured a secret indictment in the Hood River County Circuit Court, charging defendant with murder. A judge immediately issued a warrant for defendant's arrest. In early 2015, defendant was located and detained at the San Francisco International Airport after arriving there on an overseas flight from China, en route to Oregon, with his daughter. Two detectives from the San Mateo County Sheriff's Office responded and took over the investigation. At some point, defendant was handcuffed and remained so for several hours. He also had not slept for an extended period of time.

The detectives then interviewed defendant, who apparently was still handcuffed. At the outset of the

---

[1] We take the facts from the record below and from the trial court's memorandum opinion and order granting defendant's motion to suppress.

interview, the lead detective, Matsuura, introduced himself and the other detective, and stated that defendant was not free to leave. Matsuura then read defendant his *Miranda* rights, which defendant indicated that he understood. Matsuura began the interview by explaining that the airport fell within the jurisdiction of his office and that, when individuals are arrested at the airport, his office interviews them before lodging them in the county jail. Defendant did not respond to that explanation. The following back-and-forth then ensued between Matsuura and defendant:

"DET. MATSUURA:   *** Have you been told why you're in custody?

"[DEFENDANT]:   No.

"DET. MATSUURA:   Okay. You have a warrant for your arrest.

"[DEFENDANT]:   From where?

"DET. MATSUURA:   The state of Oregon.

"[DEFENDANT]:   For?

"DET. MATSUURA:   Homicide.

"[DEFENDANT]:   Homicide?

"DET. MATSUURA:   Homicide. Do you have any idea what that's about?

"[DEFENDANT]:   No.

"DET. MATSUURA:   Okay.

"[DEFENDANT]:   What's the name of the person?

"DET. MATSUURA:   Rhonda.

"[DEFENDANT]:   Rhonda?

"DET. MATSUURA:   *** Rhonda Castro. Do you know a Rhonda Castro?

"[DEFENDANT]:   That's *** my child's mom.

"DET. MATSUURA:   Okay. Were you guys dating at all or was it just like a one-night stand thing where you guys *** hooked up?

"[DEFENDANT]:   No.

"DET. MATSUURA: Or were you guys having a relationship?

"[DEFENDANT]: No. We were together for a long time.

"DET. MATSUURA: Okay. Do you have any idea why there's a warrant for your arrest for a homicide for \*\*\* the mother of your daughter?

"[DEFENDANT]: I don't.

"DET. MATSUURA: None at all?

"[DEFENDANT]: No.

"DET. MATSUURA: Well, obviously something happened. *Do you know the circumstances behind her death?*

"[DEFENDANT]: *Yeah.*

"DET. MATSUURA: *Can you tell me about it?*

"[DEFENDANT]: *It's not something I want to talk about. It's—*

"DET. MATSUURA: Well, I want to make sure I don't have a serial murderer walking into my jail.

"[DEFENDANT]: I'm not—

"DET. MATSUURA: You know what I mean.

"[DEFENDANT]: I'm not a killer.

"DET. MATSUURA: I—

"[DEFENDANT]: I'm—

"DET. MATSUURA: I don't know that. I don't know you. I can't make that \*\*\* decision one way or another. But for the safety and security of my facility, I want to make sure I don't have the serial murderer walking into my facility without knowing it. Can you see my point?

"[DEFENDANT]: Yeah.

"DET. MATSUURA: Okay. I'm not here to draw judgment on you one way or the other. I'm just looking for some information. So if you can tell me \*\*\* about the circumstances of how she died, that'd be great."

(Emphases added.) Defendant then told the detective that the victim had died about six years earlier after falling from a cliff. The interview continued for about three hours,

touching on many subjects. Defendant thereafter was booked in the local county jail and later was transported back to Oregon and arraigned.

Defendant moved to suppress his statements from the interview, asserting violations of his state and federal constitutional rights against compelled self-incrimination when questioning continued after he had stated, "[i]t's not something I want to talk about."[2] Defendant alternatively argued that his statement had been either an unequivocal invocation, which required the detectives to stop the interview, or an equivocal invocation, which he asserted required the detectives, under Article I, section 12, to clarify his intent as to the invocation. The state responded that defendant's statement did not qualify as an invocation, either unequivocal or equivocal. The state continued that, even if defendant had made an equivocal invocation, the detectives would have been permitted to continue the interview without asking clarifying questions and, therefore, no violation of defendant's Article I, section 12, right against compelled self-incrimination had occurred.

To decide the merits of defendant's motion, the trial court considered evidence consisting of an audio recording and transcript of the interview, and heard argument at a pretrial hearing, but did not hear any witness testimony. The court ultimately ruled that suppression was warranted. The court first determined that defendant's statement had been ambiguous because it could have been an invocation or it could have been defendant's way of signaling that the topic of the victim's death was still an emotionally charged one, although not foreclosing his willingness to discuss it. The court thus characterized the statement as an equivocal invocation under Article I, section 12, which, in the court's view, required the detectives to ask clarifying questions to determine whether defendant was invoking his right against compelled self-incrimination. Because the detectives failed to do so, the court concluded, defendant's right under Article I, section 12, had been violated, and the resulting interview statements must be suppressed. The state appealed to this court. *See* ORS 138.060(2)(a) (if defendant charged with

---

[2] We do not address any federal constitutional question on direct appeal.

murder or aggravated murder, state may directly appeal trial court order suppressing evidence to this court).

On direct appeal, the parties repeat the invocation arguments summarized above—focusing first on whether defendant made an unequivocal invocation of the right against compelled self-incrimination under Article I, section 12, or, alternatively, whether he made an equivocal invocation or even any invocation at all. The state also repeats its argument that, if defendant made an equivocal invocation, the detectives were not required to ask clarifying questions, and it urges this court to consider that question anew under Article I, section 12. The state in particular argues that this court's case law to date merely assumes that Article I, section 12, imposes a duty to clarify, but does not expressly so hold, and adds that, by contrast, the Fifth Amendment to the United States Constitution imposes no such duty.[3] The state further contends that, if anything, defendant merely demonstrated an intent to not respond to questions about certain topics, but not an intent to invoke his right against compelled self-incrimination, such that the detectives were required to stop the interview.

Defendant counters that this court previously has held—and should continue to hold—that, if a suspect equivocally invokes the right against compelled self-incrimination, law enforcement officers are required to clarify the suspect's intent as to the invocation before proceeding further. Defendant otherwise alternatively responds that he was entitled to "selectively invoke" that right as to questions on certain topics, and, once he did so, the detectives were precluded from asking further questions about those topics.

We review for error of law—that is, we determine as a matter of law whether defendant's statement amounted to an unequivocal invocation or, if not, then whether it amounted to an equivocal invocation or no invocation at all. *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014);

---

[3] *Compare State v. Meade*, 327 Or 335, 340, 963 P2d 656 (1998) (noting obligation of law enforcement to clarify equivocal invocation of derivative right to counsel under Article I, section 12), *with Berghuis v. Thompkins*, 560 US 370, 381-82, 130 S Ct 2250, 176 L Ed 2d 1098 (2010) (suspect must unambiguously invoke Fifth Amendment right to remain silent).

*State v. McAnulty*, 356 Or 432, 449, 338 P3d 653 (2014), *cert den*, 136 S Ct 34 (2015). As explained below, we conclude that defendant made an unequivocal invocation.[4]

We begin by setting out some familiar principles. Article I, section 12, establishes a right against compelled self-incrimination.[5] To protect that right, police must give *Miranda* warnings to a suspect who is in custody or in otherwise compelling circumstances. *McAnulty*, 356 Or at 454. If a suspect unequivocally invokes his or her right against compelled self-incrimination during a custodial interrogation, then police must honor that request and stop the interrogation. *Id*. at 455; *see also State v. Davis*, 350 Or 440, 459, 256 P3d 1075 (2011) (Article I, section 12, embodies right to insist that police refrain from interrogation after person in custody or compelling circumstances invokes right to remain silent). A suspect may waive that right, however, so long as the waiver is knowing, intelligent, and voluntary under the totality of the circumstances. *McAnulty*, 356 Or at 455. The state bears the initial burden of showing that a defendant charged with a crime validly waived the right; if the defendant initially waives the right, then the defendant bears the burden to show that he or she later invoked it. *See State v. James*, 339 Or 476, 491, 123 P3d 251 (2005) (explaining burden of proof in context of derivative right to counsel during interrogation afforded under Article I, section 12).

In this case, the parties do not dispute that defendant was subject to custodial interrogation; that the detectives provided *Miranda* warnings advising defendant of

---

[4] In reviewing the trial court's determination that defendant made an equivocal invocation, we are bound by the trial court's findings of historical fact if evidence in the record supports them. *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005); *see also Avila-Nava*, 356 Or at 609 (what transpired during interrogation, including what defendant said or did not say, is question of fact; although bound by facts supported by evidence in record, appellate court assesses anew whether those facts are sufficient to meet constitutional standards). In this case, the trial court found that defendant and Matsuura made the statements set out earlier in this opinion, and the record supports that finding. The court did not, however, make any additional finding based on evidence in the record—for example, assessing defendant's or the detectives' tone or demeanor, or making any related credibility determination—relating to the circumstances of the interview.

[5] Article I, section 12, provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself."

his rights under Article I, section 12; and that defendant indicated that he understood those warnings. Defendant contends as an initial matter that, although he acknowledged the warnings, he did not waive his right against compelled self-incrimination—he argues that the preliminary back-and-forth with Matsuura instead showed that he was merely trying to understand why he had been arrested. The state counters that defendant waived his *Miranda* rights at the outset of the interview, and we agree that the record supports the state's position.[6] After indicating that he understood his rights, defendant chose to answer some initial questions about the victim, and nothing in the record suggests a lack of knowledge, consent, or voluntariness about that decision. We conclude that, in choosing to do so, defendant initially waived his right against compelled self-incrimination under Article I, section 12. *See State v. Collins*, 253 Or 74, 75, 453 P2d 169 (1969) (answering police questions following *Miranda* warnings is evidence of waiver of rights under Article I, section 12); *State v. Davison*, 252 Or 617, 621, 451 P2d 481 (1969) (unnecessary to articulate waiver following warnings; rather, clear and unambiguous conduct by person advised of rights that includes willingness to answer questions sufficient to establish waiver).

The next question is whether, after initially waiving his right against compelled self-incrimination under Article I, section 12, defendant unequivocally invoked that right shortly thereafter, when he responded to Matsuura's request that he tell the detectives about the circumstances of the victim's death by answering, "It's not something I want to talk about." In ascertaining whether defendant made an unequivocal invocation, our task is to consider his words "in the context of the totality of circumstances existing at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right." *Avila-Nava*, 356

---

[6] The trial court did not make any finding or reach any express conclusion about defendant's waiver of *Miranda*. Our determination that defendant waived his *Miranda* rights is not inconsistent with the trial court's conclusion on the merits, relating to defendant's subsequent asserted invocation. *See generally James*, 339 Or at 482 n 5 (if trial court made no factual finding about disputed fact, appellate court presumes that trial court found facts in a manner consistent with its ultimate conclusion).

Or at 613. That evaluation may include "preceding words spoken by the defendant and the interrogating officer[;] the demeanor, gestures, and speech patterns of the defendant[;] the demeanor and tone of the interrogating officer[;] and the point at which the defendant allegedly invoked the right to remain silent." *Id.* at 614; *see also State v. Charboneau*, 323 Or 38, 55, 913 P2d 308 (1996) (invocation question evaluated based on totality of circumstances).

We begin with the words that defendant identifies as having amounted to an unequivocal invocation: "It's not something I want to talk about." Viewed in isolation, those words are, at least arguably, ambiguous: A reasonable officer could have understood that defendant was invoking his right under Article I, section 12, or, alternatively, that defendant was expressing a desire to not discuss, or at least a reluctance to discuss, the circumstances of the victim's death. *See generally Avila-Nava*, 356 Or at 609 (interpretation required when defendant's words are ambiguous, as ordinary people would understand them).

In arguing that those words did not clearly convey any intent to invoke the right against compelled self-incrimination, the state accurately describes contrasting wording from other cases in which this court concluded that unequivocal invocations had occurred. *See id.* at 603, 617 (defendant who stated, "I won't answer any questions," unequivocally invoked, when record suggested no language barrier or confusion on defendant's part, or that reasonable officer would have understood defendant instead to be asking a question); *McAnulty*, 356 Or at 451-52, 456 (defendant's first two invocations—"I don't want to talk anymore" and "I don't want to talk no more"—unambiguously communicated her desire to no longer speak with detectives); *see also State v. Acremant*, 338 Or 302, 322, 108 P3d 1139, *cert den*, 546 US 864 (2005) (defendant's statement—"I think that I do need a lawyer[,] I do"—unambiguously expressed his desire to consult with counsel before speaking with detectives); *State v. Kell*, 303 Or 89, 97, 734 P2d 334 (1987) (citing *Smith v. Illinois*, 469 US 91, 100, 105 S Ct 490, 83 L Ed 2d 488 (1984), wherein the defendant, upon being advised of right to counsel and asked if he understood, answered "Uh, yeah[,] I'd like to do that"; Supreme Court concluded that

he unambiguously invoked his derivative right to counsel). The unequivocal invocations in those cases all share a commonality that this case does not: In each case, the defendant expressed his or her intent by first self-identifying as the actor ("I") and then by clearly stating the desired action or view relating to the right in question (won't answer questions, don't want to talk, need a lawyer). Simply stated, each of those cases involved classic and easily understood words of invocation.

By contrast, defendant's statement did not focus on defendant as the actor taking an action; rather, it focused on the topic of Matsuura's question ("*It's* not something I want to talk about." (Emphasis added.)) That is, on its face, it did not directly convey—at least not as clearly as the statements in the cases just noted—an intention on defendant's part to take the affirmative action of either invoking his right against compelled self-incrimination under Article I, section 12, or expressing the desire to do so. As the trial court observed, defendant's words, standing alone, could have been understood by a reasonable officer to be an unequivocal invocation or, alternatively, as an equivocal invocation or a reluctance to discuss an emotionally charged topic.[7] Of course, particular or precise wording is not required to invoke the right in question. *See generally Davis v. United States*, 512 US 452, 459, 114 S Ct 2350, 129 L Ed 2d 362 (1994) (to invoke derivative right to counsel, criminal suspect not required to "speak with the discrimination of an Oxford don"; rather, suspect must articulate his or her desire sufficiently clearly, such that a reasonable police officer in the circumstances would understand the request). Nevertheless, when isolated from its context, defendant's statement plausibly could be construed in more than one way.

---

[7] At oral argument, the state commented that the trial court had "found" that defendant had been expressing reluctance to discuss the topic, but that is not correct. Rather, in assessing the ambiguity, the trial court surmised that defendant's words could be construed either as an invocation or as expressing a reluctance to answer. *Cf. Avila-Nava*, 356 Or at 617 (in finding facts relating to purported invocation, courts not permitted to draw speculative inferences from interrogation circumstances). That is, the trial court's observation was just that—an observation about the nature of the words spoken and a plausible interpretation of those words as they might have shed light on defendant's intent, not a factual finding about what defendant actually intended.

When we analyze defendant's statement in the context in which it was made, however, we conclude that defendant unequivocally expressed an intent to invoke his right against compelled self-incrimination, which a reasonable officer would have understood as an invocation of that right. *See Avila-Nava*, 356 Or at 611, 614 (totality of circumstances includes context in which defendant's words were uttered, including preceding circumstances; noting other considerations beyond spoken words). Two aspects of that context are significant.

First and most notably, defendant made his statement—"[i]t's not something I want to talk about"—in response to Matsuura's request that defendant tell him about "the circumstances behind [the victim's] death." That is, the topic about which defendant unambiguously expressed a desire to not speak to the detectives went to the core of the entire investigation and the crime for which he had been arrested. When defendant clearly expressed a desire not to speak about the alleged crime that had prompted his arrest, a reasonable law enforcement officer should have understood that defendant was invoking his right against compelled self-incrimination as to the entire interview. That is different from the scenario in which—as the state argues occurred here—a suspect selectively answers some questions but declines to answer others. *See Kell*, 303 Or at 99 (suspects undergoing interrogation or in otherwise compelling circumstances may "pick and choose what [they] wish[] to talk about"). The facts in *Kell* illustrate the difference. In that case, after waiving his *Miranda* rights, the defendant chose to speak freely and at length "about every aspect of the case," except for identifying who had conceived the manner of committing the crime. *Id.*; *see also State v. Smith*, 310 Or 1, 10, 791 P2d 836 (1990) (defendant's statement during interview, "I have nothing to say," in context of responding to hypothetical description of how he might have killed his wife, demonstrated that defendant chose to answer some questions but not others). By contrast, defendant in this case did not decline to answer a question about a particular or discrete topic. Instead, he answered, "[i]t's not something I want to talk about," in response to a direct question about the circumstances of the victim's death, which was the

underlying basis for the murder charge against defendant, the warrant for his arrest, and the interrogation for which he had been provided *Miranda* warnings.[8]

Second, defendant made that statement near the beginning of his interview with the detectives, following initial back-and-forth about the warrant for his arrest and confirmation about the identity of and his relationship with the victim. That, again, is different from the context of the law enforcement interviews that occurred in *Kell* and *Smith*. In those cases, by the point in time when the defendants made their purported invocations, they had fully participated in investigatory interviews. Stated another way, the interviews in *Kell* and *Smith* unfolded in a significantly different manner from defendant's interview; unlike those cases, defendant did not first speak on a range of topics and then decline to answer a question or otherwise indicate that he had nothing to say about one discreet topic. *See Smith*, 310 Or at 10 (defendant's interview ultimately terminated because defendant was tired; at one point during interview, after detective suggested hypothetical idea about the crime, defendant replied, "I have nothing to say"); *Kell*, 303 Or at 100 n 3 (defendant "just kept on talking" and stated that he would talk, except that he wanted a lawyer in relation to questions about whether the crime had been his idea). Instead, as soon as Matsuura directly asked defendant to discuss the subject of the circumstances of the victim's death, defendant affirmatively and unequivocally stated his desire to not do so.[9]

---

[8] The state argues that, in contrast to the statements in *Avila-Nava*, 356 Or at 603, and *McAnulty*, 356 Or at 456, defendant's statement was not directed at ending the interrogation; instead, at most, defendant merely sought to alter the course of the interrogation, not end it. We disagree, for the reasons stated above: Defendant's statement responded to a request to tell the detectives about the circumstances of the victim's death—the stated reason for his arrest and the interrogation—thus conveying his desire to end the interrogation.

[9] The state cites another case, *People v. Silva*, 45 Cal 3d 604, 247 Cal Rptr 573, 754 P2d 1070 (1988), *cert den*, 488 US 1019 (1989), to support its argument that defendant's statement merely demonstrated an unwillingness to discuss a particular topic. The facts of *Silva*, however, align with *Kell*, 303 Or 89, and *Smith*, 310 Or 1, not with the facts of this case. As in *Kell* and *Smith*, the defendant in *Silva* fully participated in an interview with law enforcement, in which he provided acknowledgment and information about various circumstances of the crime. Then, when asked twice about a factual aspect of the crime and his involvement, he responded, "I don't know. I really don't want to talk about that."

The state points to additional considerations discussed in *Avila-Nava*, such as the speech pattern of the suspect and the tone and demeanor of the interrogating officer. 356 Or at 614. The state in particular argues that the audio recording of defendant's interview—which the trial court listened to before making its ruling—shows that the initial exchange between defendant and Matsuura was "low-key." The recording does reveal that defendant spoke in a non-animated way, but that manner of speech was consistent with the fact that defendant had not slept for an extended period of time. Matsuura, in turn, displayed a polite and restrained tone toward defendant until defendant stated, "[i]t's not something I want to talk about," at which point Matsuura's tone became more forceful, as he discussed the danger of booking a "serial murderer" in his jail. Nothing about defendant's speech pattern or Matsuura's tone and demeanor alters our analysis of the other contextual circumstances, in which defendant clearly expressed, at essentially the outset of the interview, a desire not to discuss the underlying reason for his arrest and interrogation.

In sum, after considering defendant's statement, in the context of the totality of the circumstances existing up to and when he made that statement, we conclude that a reasonable law enforcement officer would have understood that defendant had invoked his right against compelled self-incrimination under Article I, section 12. And, because defendant unequivocally invoked his right, the detectives were required to cease the interrogation. *See Avila-Nava*, 356 Or at 612 n 7 (stating principle; contrasting with

---

*Silva*, 45 Cal 3d at 629, 754 P2d at 1083. Citing the principle that a suspect may indicate an unwillingness to discuss certain subjects without expressing a desire to terminate an interrogation in progress, and considering additional circumstances that included the defendant's vocal inflection when he made his statement, the California Supreme Court determined that no constitutional violation had occurred. *Id.*

In this case, initially, defendant arguably hinted that he might discuss the victim's death, when he answered "Yeah" in response to Matsuura's preliminary question, "Do you know the circumstances behind [the victim's] death?" But then, he made his statement—"[i]t's not something I want to talk about"—immediately in response to Matsuura's next, similarly broad, question, directly asking defendant to tell Matsuura about those circumstances. In the totality of the circumstances surrounding defendant's statement, he did not display any willingness, at essentially the outset of the interview, to discuss the victim's death; rather, he displayed an intent to invoke his right against self-incrimination.

scenario in which a defendant subsequently re-opens dia-
logue with unprompted statements, thus indicating willing-
ness to have generalized discussion). Instead of doing so,
however, they first continued to press defendant to answer
and then further questioned him after he relented. Those
actions violated Article I, section 12, and, accordingly, the
trial court did not err in granting defendant's motion to sup-
press all the interview statements that he made following
his invocation.

The order of the circuit court is affirmed.