Argued and submitted May 4, 2022; portion of judgment requiring defendant to pay attorney fees reversed, otherwise affirmed January 11; petition for review denied April 20, 2023 (371 Or 21)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TONY EUGENE HADD,
*Defendant-Appellant.*

Washington County Circuit Court
19CR40302; A173360

523 P3d 1123

Defendant appeals from a judgment of conviction for two counts of second-degree rape and one count of first-degree sexual abuse. Defendant assigns error to the denial of his motion to suppress arguing that detectives failed to provide *Miranda* warnings and that they failed to clarify whether defendant had invoked his right to remain silent when he stated, "See, now we're done." *Held*: The trial court did not err in denying the motion to suppress. First, defendant failed to preserve the *Miranda* issue. Second, regarding the invocation question, a review of defendant's words and the preceding circumstances, including defendant's unusual speech patterns and his demeanor, indicates that defendant did not invoke his right to remain silent. Regarding the remaining assignments of error, there was no abuse of discretion when the trial court admitted evidence of uncharged misconduct involving defendant and the same victim. Although the trial court erred when it provided a jury instruction that permitted nonunanimous verdicts, the error was harmless because the verdicts were unanimous. The state concedes that it was plain error for the trial court to order defendant to pay attorney fees. The Court of Appeals exercises its discretion to correct the error.

Portion of judgment requiring defendant to pay attorney fees reversed; otherwise affirmed.

Henry Kantor, Senior Judge.

Marc Brown, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Pagán, Judge, and Armstrong, Senior Judge.

PAGÁN, J.

Portion of judgment requiring defendant to pay attorney fees reversed; otherwise affirmed.

## PAGÁN, J.

Defendant appeals from a judgment of conviction for two counts of rape in the second degree, ORS 163.365, and one count of sexual abuse in the first degree, ORS 163.427. Defendant raises five assignments of error. In his first assignment, defendant argues that the trial court erred when it denied his motion to suppress statements made prior to his indictment. In his second assignment, defendant claims that the trial court erroneously admitted evidence of uncharged misconduct. In his third and fourth assignments, defendant takes issue with a jury instruction that permitted the jury to find defendant guilty by nonunanimous verdicts. And in his fifth assignment, defendant argues that the trial court erred when it ordered him to pay attorney fees.

We focus most of our attention on defendant's first assignment of error. For the reasons explained below, we conclude that the trial court did not err in denying defendant's motion to suppress. We also reject defendant's second, third, and fourth assignments of error. Regarding defendant's fifth assignment, the state concedes that the trial court erred by ordering defendant to pay attorney fees. We agree and accept the concession. Accordingly, we reverse the portion of the judgment requiring payment of attorney fees but otherwise affirm.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In April 2019, a 13-year-old girl disclosed to her mother and to a school counselor that defendant, a 40-year-old friend of her mother, had sexually abused her. She indicated that the abuse began on a camping trip in the summer of 2018 and lasted several months. On May 30, 2019, police interviewed defendant at the Canby Police Department. During the interview, defendant did not confess or admit to the conduct, but he did make a number of inconsistent statements.

Detectives Rinell and Hicks met with defendant at the Canby Police Department, rather than at the police station where the detectives worked, because the Canby location was closer to where defendant lived. Rinell asked most

of the questions.[1] The room consisted of one door and no windows. The two detectives were seated between defendant and the door. All three remained seated during the entire interview.

At the beginning of the interview, Rinell told defendant that the interview was being recorded, and defendant confirmed that he understood he was free to leave. Rinell told defendant that the door was unlocked, that the room was just around the corner from the lobby, and that she wanted to make defendant "as comfortable as possible." Defendant stated, "I'm aware, and I just want to know what this is about." What followed was a discussion of numerous topics including defendant's family, defendant's legal problems, and the victim's mother, whom defendant accused of selling methamphetamine. Defendant frequently talked over Rinell and rarely provided direct answers to her questions.

About 44 minutes into the discussion, defendant— not the detectives—mentioned that the victim's mother had accused him of touching her daughter. When Rinell attempted to follow up, defendant talked about how the victim's mother also accused him of smoking marijuana with the victim, which defendant denied. Rinell attempted to focus on those accusations, but defendant began discussing an incident during which he was arrested when he went to a courthouse to contest a restraining order.

Just over 56 minutes into the discussion, defendant mentioned again that there were accusations against him. Defendant stated that he was "open when it comes to things that people are saying about me, I am open." Rinell clarified that defendant's mother, who was waiting in the lobby, was not going to know what was said in the room. Defendant joked that he had told his mother that "if I don't come out, then somebody is getting broken." Defendant began talking about a negative encounter that he had with a police officer,

---

[1] The record on appeal includes a recording of the entire interview, which was offered as an exhibit and received for purposes of the pretrial hearing. The record also includes video clips of excerpts from the interview that were played to the jury during trial. In reviewing the denial of the motion to suppress, we do not rely on the video clips. *See State v. Pitt*, 352 Or 566, 575, 293 P3d 1002 (2012) ("[W]e will evaluate a claim of pretrial error on the basis of the same record that the trial court relied on in making the challenged ruling.").

and Rinell let him know that "if at any time you are more comfortable having Detective Hicks not be here, I'm fine with that too." Defendant did not request that Hicks leave.

Rinell accused defendant of providing marijuana to the victim. Defendant denied doing so but admitted that he may have "neglected by leaving stuff out." After a discussion about whether there had been a Monster Energy can in his Jeep that had been used to smoke marijuana, defendant stated that Rinell was asking "return questions" that would cast him in a negative light no matter how he answered them.

Rinell switched the discussion to the camping trip. Defendant acknowledged that there were occasions during a camping trip when he was alone with the victim. Defendant believed that she had a "crush" on him because she told him that she had a dream about him, but he told her that he did not want to hear about it and to keep it to herself. When Rinell asked about times when defendant was alone with the victim in the car, defendant joked that he was "an asshole" in the car. Defendant stated that he "lacked a filter," and therefore he often said things that he should not. Then, about an hour and twenty minutes into the interview, the following exchange occurred:

"DETECTIVE RINELL: She's given me some specifics. She's been interviewed by some professionals that interview kids all day long.

"[DEFENDANT]: Oh.

"DETECTIVE RINELL: There's been video tapes, she's had tests done. Polygraph. I mean, all that stuff has been done.

"[DEFENDANT]: It has?

"DETECTIVE RINELL: So I know where we're coming from. I'm just trying to ascertain reasons so that when I write my report—

"[DEFENDANT]: Mm-hmm.

"DETECTIVE RINELL: —we have a reason for why some of this stuff has happened. And whether that's you kind of felt a role—filled a role of kind of a boyfriend role,

because maybe she looks up to somebody older, a little more mature, someone who's got their stuff together. Someone who's strong and (indiscernible).

"[DEFENDANT]:    Yeah.

"DETECTIVE RINELL: Well, for her, you're a grown-up. You're a grown-up, looking for (indiscernible) exactly. You have your shit together and you pay attention to her. Like that's a big deal.

"[DEFENDANT]:    (Indiscernible).

"DETECTIVE RINELL:    Okay. So my point is—

"[DEFENDANT]:    I don't signal anybody out.

"DETECTIVE RINELL:    —my point is you can—I know some things happened. I guess I'm looking to see what you can tell me about your involvement with her, or your physical involvement with her and how far it went.

"[DEFENDANT]:    There was no physical—

"DETECTIVE RINELL:    Knowing that—knowing that, and, again, I stress to you, I'm not lying to you.

"[DEFENDANT]:    (Indiscernible).

"DETECTIVE RINELL:    And I already told you—I already told you, your mom is sitting out there. Nobody is handcuffing you. The door's right behind me.

"[DEFENDANT]:    Well, I don't give a shit. (Indiscernible)—

"DETECTIVE RINELL:    Like I'm trying to be this—

"[DEFENDANT]:    —like I said, my care level would be—

"DETECTIVE RINELL:    I'm trying to make this low-key—

"[DEFENDANT]:    So, basically you think I'm guilty of something—

"DETECTIVE RINELL:    I'm not saying—

"[DEFENDANT]:    —and you're not going to tell me. You want me to tell you (indiscernible)—

"DETECTIVE RINELL:    Oh, you want me to tell you? Do you want me to tell you?

"[DEFENDANT]:   Yeah.

"DETECTIVE RINELL:   I mean, I'll tell you. So here's the deal. I don't think—I don't know you. I'm not here to say if you're guilty or innocent—

"[DEFENDANT]:   Mm-hmm.

"DETECTIVE RINELL:   —to be honest with you. I know I have some facts over here that tell me certain things that I know happened, but there's always reasons why things happen, right? It doesn't mean that someone is going to go to jail. It doesn't mean that someone is guilty. It doesn't mean that, you know, things even have to move forward past today—

"[DEFENDANT]:   Now you're crossing yourself over. Just get on with what you think that I done.

"DETECTIVE RINELL:   I don't want to just say the word think. What I believe is—

"[DEFENDANT]:   Okay. Well, tell me what you believe.

"DETECTIVE RINELL:   I believe—

"[DEFENDANT]:   I'm sorry.

"DETECTIVE RINELL:  No. That's okay. What I believe is that you and [the victim] had intercourse. I believe that.

"[DEFENDANT]:   See, now we're done.

"DETECTIVE RINELL:   And—

"[DEFENDANT]:   Because you're out of your mind and you already assume—

"DETECTIVE RINELL:   Okay. So tell me why—tell me why I'm out of my mind?

"[DEFENDANT]:   Tell me why you would think that? You know why?

"DETECTIVE RINELL:   Do you want me to tell you why?

"[DEFENDANT]:   Absolutely.

"DETECTIVE RINELL:   —what do you know? What are you going to tell me? I want to tell you. I want to give you as much information as I can—

"[DEFENDANT]:    So (indiscernible)—

"DETECTIVE RINELL:    —so you can make your best decision and do the right thing.

"[DEFENDANT]:    Well, my decision is the truth."

After that exchange, the discussion continued for another hour and 10 minutes. Defendant did not admit to having sexual intercourse with the victim. At the end of the interview, defendant left the police station.

About three weeks later, a grand jury indicted defendant. The indictment consisted of 13 counts, including rape in the second degree, ORS 163.365, sexual abuse in the first degree, ORS 163.427, and sodomy in the second degree, ORS 163.395. Before trial, focusing on his statement, "See, now we're done," defendant moved to suppress statements he made to the detectives. The state filed a response arguing that defendant did not invoke his right to remain silent and that his statement "was closer to an angry outburst, or an expression of disappointment * * *. It was so casually thrown in the conversation that neither Detective Rinell, nor the other detective in the room even picked up on the statement."

At the hearing on the motion, Rinell testified that the general tone of the interview was "[c]onversational. It did go up and down somewhat." She described defendant as very talkative. According to Rinell, defendant "would start to answer a question but he would never give you a direct answer[.]" In her view, defendant wanted to keep talking, and she interpreted his comment as an indication that "[h]e was frustrated with my statement." Rinell pointed out that defendant immediately followed up with a claim that the detective was out of her mind. It did not occur to Rinell to ask clarifying questions about whether defendant wanted the interview to end. Rinell viewed the defendant's statement as one in a series of "talk-over comments" that occurred throughout the interview.

The state argued that there were "two officers who have extensive law enforcement experience," and it occurred to neither of them that defendant intended to invoke his right to remain silent. The state pointed out that defendant was "talking over" the detective and interrupting her

throughout the interview. In the state's view, by continuing to talk, defendant indicated that he wanted the conversation to continue.

After taking the matter under consideration, the trial court denied the motion to suppress. In denying it, the trial court ruled as follows:

"Here we have a situation where this phrase came out of the middle of nowhere. It wasn't a phrase that the defendant had used before in his conversations with the detectives. It was part of a very free-flowing conversation where both sides felt free to talk over each other. Didn't seem to be rude. It just seemed to be the way the conversation was going.

"And clearly there was a level of frustration that was building with the defendant. I'm a little concerned that the detectives didn't seem to pick up on that so much and that rather they might—they might have noticed that.

"But the standard really is, you know, whether a reasonable police officer would determine that in those circumstances. Preliminar[ily,] *** I do not believe the defendant made an unequivocal request to stop.

"To me, the only standard here is whether it was close enough to equivocal to warrant the police officers to inquire further. I don't think it gets to unequivocal at all.

"So let me make my notes here. Just before, the defendant used a different phrase where he talked about the detective crossing—you're crossing yourself over, which was another interesting phrase. And to me it suggested that the defendant would use somewhat unusual phrases to communicate his concerns and meaning, and not every phrase has to be perfectly understandable to both sides to have a meaningful conversation.

"For example, I don't know if they knew what he meant by crossing yourself over. I could see two or three different meanings coming out of that.

"The phrase, 'Now we're done' in the context of how he put it was he didn't say what we're done with. He didn't indicate in any sense that he was done with talking, because he didn't take a breath and just kept talking.

"In order for the police officer—the detectives to have inquired further, they would have had to literally almost yell and to stop him from talking, and whenever they tried to do that in the other minutes, I assumed whenever they tried to talk over and try to redirect him, that didn't work. It just flat out didn't work. He was determined to say what he wanted to say.

"So, under the circumstances of this case, I'm going to conclude that it was reasonable for the detectives to not conclude that this was an equivocal request to stop so that they would have to inquire further.

"I do think it's a close call. I appreciate that. But it doesn't seem to compare well to the other cases that the parties have cited to me. I think it falls into free-flowing conversation with a phrase that didn't really communicate to a reasonable person or a reasonable police officer that the intent was to stop the conversation. So I'm going to deny the motion."

The trial court also addressed motions pertaining to evidence of prior sexual encounters between defendant and the victim on a camping trip and after smoking marijuana in a Jeep. The state initially filed charges against defendant based on those incidents, but the charges were dismissed after it was discovered that the incidents occurred in a different county. Nevertheless, the state argued that the evidence was relevant and admissible. Defendant argued that the evidence was unfairly prejudicial. After engaging in OEC 403 balancing, the trial court ruled that the evidence was admissible subject to a limiting instruction.

During trial, the state used inconsistent statements from defendant's May 2019 interview to attack his credibility and to portray him as dishonest. The jurors also heard testimony regarding interactions between defendant and the victim that were not alleged as crimes; namely, their use of marijuana and sexual encounters on a camping trip and in a Jeep. Defendant testified at his trial, and he denied having any sexual contact with the victim. A jury found defendant guilty of nine counts. The trial court merged several counts and entered convictions on two counts of second-degree rape and one count of first-degree sexual abuse. Defendant was sentenced to 180 months in prison and ordered to pay $500 in attorney fees.

## II.  ANALYSIS

### A.  *The First Assignment of Error*

In his first assignment, defendant argues that the trial court erred when it denied his pretrial motion to suppress. First, defendant contends that he was in compelling circumstances, but the detectives failed to provide *Miranda* warnings, which violated defendant's rights under Article I, section 12, of the Oregon Constitution and under the Fifth Amendment to the United States Constitution.[2] Second, defendant argues that he invoked his right to remain silent when he stated, "See, now we're done," and the detectives, at a minimum, should have sought to clarify his statement. Because the detectives failed to do so, defendant argues that all statements he made after that point should have been suppressed. Defendant further argues that the error in denying his motion was not harmless.

The state responds that defendant's argument regarding the failure to provide *Miranda* warnings was not preserved, and, in any case, it has no merit because defendant was not in custody or compelling circumstances. The state argues that defendant did not invoke his right to remain silent, and, even if his statement could be construed as an invocation, the detectives did not violate his constitutional rights by continuing to question him because he was not in custody or compelling circumstances. We are not persuaded that defendant invoked his right to remain silent.

### 1.  *Legal principles*

We review the denial of a motion to suppress for errors of law. *State v. Tellez-Suarez*, 312 Or App 531, 534, 493 P3d 28, *rev den*, 368 Or 788 (2021). We defer to the factual findings of the trial court—including as to what transpired during a custodial interrogation and what a defendant did or did not say. *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d

---

[2]  In *Miranda v. Arizona*, 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the United States Supreme Court held that the Fifth Amendment requires particular warnings to be given when a person is in custody or "otherwise deprived of his freedom of action in any significant way." Article I, section 12, of the Oregon Constitution is an independent source for warnings similar to those required under the Fifth Amendment. *State v. Nieman*, 242 Or App 269, 271 n 1, 256 P3d 126, *rev den*, 350 Or 571 (2011).

714 (2014). However, we assess anew whether those facts suffice to meet constitutional standards. *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005).

Article I, section 12, provides, in part, that "[n]o person shall be \*\*\* compelled in any criminal prosecution to testify against himself." That constitutional guarantee protects a person's right against compelled self-incrimination. *Avila-Nava*, 356 Or at 608; *State v. Sanelle*, 287 Or App 611, 617, 404 P3d 992 (2017), *rev den*, 362 Or 482 (2018). "Both the right to counsel during interrogation and the right to silence are derivative of that broader right." *Tellez-Suarez*, 312 Or App at 534.

"The right attaches only when a person is in custody or other compelling circumstances." *State v. Dodge*, 297 Or App 30, 32, 441 P3d 599, *rev den*, 365 Or 533 (2019) (discussing right to counsel). Whether the circumstances were compelling is "the predicate issue" when analyzing whether there has been a violation of the right against self-incrimination. *State v. Turnidge (S059155)*, 359 Or 364, 401, 374 P3d 853 (2016), *cert den*, ___ US ___, 137 S Ct 665 (2017). If a defendant is in custody or compelling circumstances, then "police must give *Miranda* warnings." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006). In determining whether the circumstances were compelling, our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

Defendants who waive their *Miranda* rights may subsequently invoke them. *See State v. Nichols*, 361 Or 101, 108, 390 P3d 1001 (2017) ("The next question is whether, after initially waiving his right against compelled self-incrimination under Article I, section 12, defendant unequivocally invoked that right shortly thereafter \*\*\*."); *see also State v. Castillo*, 295 Or App 121, 127, 433 P3d 467 (2018), *rev den*, 364 Or 749 (2019) ("The right to remain silent includes the right to cut off questioning after an initial waiver." (Internal quotation marks omitted.)). In determining whether there was an invocation, and if so, whether it was equivocal or unequivocal, we look to "the defendant's words, in light of the totality of the circumstances at and

preceding the time they were uttered[.]" *Avila-Nava*, 356 Or at 612. If the invocation is unequivocal, the questioning must cease. *State v. Hickman*, 289 Or App 602, 606, 410 P3d 1102 (2017). If the invocation is equivocal, law enforcement can either terminate the questioning or seek to clarify the statement. *Id*.

## 2. *Preservation*

Before applying those principles, we address the state's contention that defendant did not preserve the argument that his right against self-incrimination was violated by the failure to provide *Miranda* warnings. We agree with the state that defendant failed to preserve the issue.

In general, if an issue has not been presented to the trial court, we will not consider it on appeal. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). The purposes of the preservation requirement are: (1) to apprise the trial court of a party's position such that it can consider and rule on it, which "may obviate the need for an appeal"; (2) to ensure fairness to the opposing party by avoiding surprise and allowing that party to respond to a contention; and (3) to foster full development of the record. *Id*. at 219-20. In *State v. Hall*, 238 Or App 75, 85, 241 P3d 757 (2010), we determined that the defendant did not preserve his *Miranda* argument for appellate review. As we explained in *Hall*, "[h]ad the state been on notice that defendant intended to maintain a *Miranda* argument, it is quite possible that the factual record would have developed differently with respect to whether the surrounding circumstances were compelling." *Id*. at 84-85.

The same reasoning applies here. First, if defendant had argued below that the detectives failed to provide *Miranda* warnings, then the record might have developed differently, including by developing facts regarding how defendant arrived at the Canby Police Department and how he intended to get home afterwards. *Cf. Roble-Baker*, 340 Or at 642 (noting that circumstances were compelling in part because the detective drove the defendant from her work to the police headquarters and she was depending on them to drive her back). Second, it would be unfair to the state

to address the *Miranda* issue on appeal because the state's questioning of Rinell at the pretrial hearing focused on the invocation question, and the state would likely have asked different or additional questions if defendant had argued below that he should have been *Mirandized*.[3]

And third, if the *Miranda* issue had been raised below, then the trial court might have concluded that the circumstances were not compelling, which might have obviated the need to address the invocation question. *See State v. Davis*, 350 Or 440, 459, 256 P3d 1075 (2011) ("[T]he court has never held that an individual's invocation of a right to remain silent in the absence of custody or other compelling circumstances precludes police from attempting to obtain incriminating information from that individual."). Based on the policies or purposes underlying the preservation requirement, we conclude that defendant failed to preserve the issue of whether his rights were violated by the failure to provide *Miranda* warnings.

In arguing otherwise, defendant acknowledges that he did not orally raise the *Miranda* issue at the pretrial hearing, but he claims that the issue was raised in his written motion. We are not persuaded. Defendant's motion to suppress mentioned the need to advise suspects of their *Miranda* rights, but it did so by way of introduction to the only issue raised in the written motion, which was that the detectives failed to honor defendant's "invocation of his right to remain silent." At the hearing on the motion, defendant's attorney stated, "I don't believe that he was *Mirandized*. But *** the issue that I'm raising is that about halfway through this interview, which has been conversational, it gets more confrontational and at the moment when it gets confrontation[al], [defendant] says 'We're done here.' *** And that just sort of gets ignored." Therefore, in both his written motion and at the hearing, defendant did not raise the issue of

---

[3] We recognize that nothing in the record establishes that *Miranda* warnings were given. However, because defendant focused on whether he had invoked his right to remain silent, and because Rinell was not asked whether *Miranda* warnings were given, we cannot rule out the possibility that the detectives provided *Miranda* warnings. At the beginning of the recorded interview, Rinell confirmed that defendant understood that he was free to leave, but it is not clear whether there was a prior discussion of *Miranda* rights.

whether the detectives failed to provide *Miranda* warnings. We therefore conclude that defendant failed to preserve that issue.[4]

### 3.  *No invocation of the right to remain silent*

We recognize that an invocation of the right to remain silent "in noncompelling circumstances does not preclude police from attempting to obtain incriminating information from a defendant at a later time when the defendant again is not in custody or compelling circumstances." *State v. Schiller-Munneman*, 359 Or 808, 812, 377 P3d 554 (2016). In the instant case, we express no opinion regarding the trial court's failure to make a threshold finding that the circumstances were compelling before addressing the invocation question. The parties never argued as much to the trial court, and it thus never addressed that issue. Turning to the only issue that was argued, we agree with the state that defendant did not invoke his right to remain silent when he stated, "See, now we're done."

Whether a defendant's statement was an invocation and, if an invocation, whether it was equivocal or unequivocal are questions of law. *Tellez-Suarez*, 312 Or App at 534. In making those determinations, we review the defendant's words in light of the preceding circumstances "to ascertain whether a reasonable officer would have understood that the defendant was invoking that right." *Avila-Nava*, 356 Or at 612. "We consider a suspect's words in context, including the preceding words spoken by the suspect and the interrogating officer; the demeanor, gestures, and speech patterns of the suspect; the demeanor and tone of the interrogating officer; and the point at which the suspect allegedly invoked the right against self-incrimination." *Tellez-Suarez*, 312 Or App at 535.

In determining whether there was an invocation, courts typically begin with the defendant's words before considering them in context. *See Nichols*, 361 Or at 109-11 (so

---

[4] Defendant does not request plain-error review. Therefore, we do not undertake the analysis. *See* ORAP 5.45(7) ("The court may decline to exercise its discretion to consider plain error absent a request explaining the reasons that the court should consider the error.").

doing). In cases of unequivocal invocations, the defendant often expresses "his or her intent by first self-identifying as the actor ('I') and then by clearly stating the desired action or view relating to the right[.]" *Id.* at 110. Examples include, "'I won't answer any questions,'" and "'I don't want to talk anymore.'" *Id.* at 109.

Those features are not present here. Instead, defendant stated, "See, now we're done." It is not clear who defendant had in mind by "we," and, as the trial court pointed out, defendant did not say what he was done with. If by "done" he meant that he wanted something to end, then it is not clear whether he meant that he and the detectives were "done" talking, or whether he meant that his relationship with the victim and her mother was "done." At the hearing on the motion, Rinell testified that it did not even occur to her that defendant might have been invoking his right to remain silent. Instead, she interpreted his statement as an expression of frustration. When considered in isolation, defendant's statement is ambiguous.

However, when considered in the context of the preceding circumstances, we conclude that defendant did not invoke his right to remain silent. As noted by the trial court, defendant often used odd phrases and peculiar expressions: he described the detective as "crossing herself over," and he took issue with the detective's use of what he termed "return questions." He also stated, "I don't signal anybody out," and he joked that he had told his mother that "if I don't come out [of the interview], then somebody is getting broken." Considered in that context, defendant's statement, "See, now we're done," was another unusual expression with no clear meaning. *See Avila-Nava*, 356 Or at 614 (court may consider the defendant's "speech patterns" in determining whether there was an invocation of rights).

Like in *Nichols*, defendant's statement was made in response to a statement by a detective that "went to the core of the entire investigation," but, unlike the defendant in *Nichols*, defendant's statement did not occur near the beginning of the interview. *Nichols*, 361 Or at 111-12. Instead, defendant's statement occurred about one hour and 20 minutes into an interview during which defendant

rarely answered questions in a direct manner and felt free to talk about a broad range of topics. Based on the preceding circumstances, in which defendant showed no hesitancy in responding to questions, albeit indirectly, we agree with the trial court that the statement at issue "came out of nowhere." That circumstance cuts against construing his statement as an invocation of the right to remain silent. *See id.* at 112 (focusing in part on how the interview unfolded in determining whether there had been an invocation of rights).

Considering defendant's demeanor, it was defendant who first brought up the allegations against him, and, in the moments before Rinell stated that she believed defendant had intercourse with the victim, defendant requested that the detective "[j]ust get on with what you think that I done." According to defendant, he "lacked a filter," and he often said things he should not. Indeed, as noted by the trial court, the statement at issue was made as "part of a very free-flowing conversation where both sides felt free to talk over each other." Defendant's demeanor did not convey a desire to end the discussion.

Further, Rinell's demeanor and tone were not hostile or threatening. She informed defendant at the beginning of the interview that he was not detained. Rinell, who remained seated throughout, reiterated that point just moments before informing defendant that she believed that he had intercourse with the victim. Additionally, the other detective said very little during the interview, and Rinell asked defendant whether he would prefer if she left the room. When construed in the context of the totality of the circumstances existing up to the point when he made the statement, we conclude that defendant's statement was not an invocation of the right to remain silent. *See State v. Smith*, 310 Or 1, 10-11, 791 P2d 836 (1990) (when analyzed in context, the defendant's statement "'I have nothing to say'" was not an invocation of the right to remain silent; instead, the defendant exercised his right to answer some questions but not others).

What occurred after defendant made the statement bolsters our conclusion. We recognize that "an accused's post request responses to further interrogation may not be

used to cast retrospective doubt on the clarity of the initial request itself." *Avila-Nava*, 356 Or at 612 (internal quotation marks omitted). At the same time, if the statement at issue is immediately followed by words inconsistent with the right to remain silent, then they may shed light on whether the statement itself was intended as an invocation of rights. *See Tellez-Suarez*, 312 Or App at 533, 537-38 (where "'I don't have a lawyer right now'" was immediately followed by the statement, "'but let's continue,'" we concluded that there was no invocation of the right to counsel).

Here, defendant's statement, "See, now we're done," was separated by little more than a breath from his statement, "Because you're out of your mind and you already assume—." Defendant also followed up immediately with questions about why Rinell would believe that he had intercourse with the victim, which is inconsistent with a desire to remain silent. As the trial court pointed out, in order for the detectives to have sought clarification, they would have had to "almost yell and to stop him from talking, and whenever they tried *** [it] didn't work. He was determined to say what he wanted to say." We agree with the trial court that defendant did not invoke his right to remain silent and the trial court did not err in denying the motion to suppress. *See State v. Meade*, 327 Or 335, 340, 963 P2d 656 (1998) ("[A] suspect's own actions may, in a given case, eliminate any need for clarification by the officers.").

Unlike Article I, section 12, the Fifth Amendment does not require police to ask clarifying questions when an invocation is equivocal. *See Avila-Nava*, 356 Or at 609 n 3. Here, we have concluded that there was no invocation at all. As a result, there could not have been a violation of defendant's Fifth Amendment rights. *See id*. at 612 n 7 (discussing Fifth Amendment cases from other states concluding that there was no invocation); *see also Tellez-Suarez*, 312 Or App at 537 (discussing the comparable Fifth Amendment invocation analysis).

B.   *The Remaining Assignments of Error*

We briefly address defendant's remaining assignments of error. In his second assignment, defendant contends that the trial court erred by admitting evidence of

uncharged misconduct because it was unfairly prejudicial. The evidence concerned sexual encounters between defendant and the victim on a camping trip and after smoking marijuana in a Jeep. Before trial, the state filed a motion to admit the evidence and defendant filed a motion to exclude it. After considering the probative value of the evidence and whether that value was outweighed by the risk of unfair prejudice to the defendant under OEC 403, the trial court ruled that the evidence was admissible subject to a limiting instruction.

"We review for abuse of discretion a trial court's determination under OEC 403 that the probative value of proffered evidence is not substantially outweighed by the danger of unfair prejudice." *State v. Terry*, 309 Or App 459, 461, 482 P3d 105 (2021). "Our role on appeal is to assess whether the trial court's decision falls within the range of legally permissible choices." *State v. Altabef*, 313 Or App 240, 246, 493 P3d 1099 (2021).

Here, there was no abuse of discretion. The evidence was relevant for two nonpropensity purposes: to show defendant's sexual interest in this particular victim and to explain the victim's delayed reporting. *See State v. Gonzalez-Sanchez*, 283 Or App 800, 802-03, 808-09, 391 P3d 811, *rev den*, 361 Or 645 (2017) (addressing same two theories of relevance).[5] And to mitigate the danger of unfair prejudice, the trial court provided a limiting instruction explaining how the jury could and could not use the evidence. *See State v. Brown*, 272 Or App 424, 432-33, 355 P3d 216, *rev den*, 358 Or 145 (2015) (risk of unfair prejudice can be mitigated by use of a limiting instruction). We conclude that the trial court did not abuse its discretion in its OEC 403 balancing. *See Altabef*, 313 Or App at 248 ("[I]t was within the legally permissible range of outcomes for the trial court to

---

[5] We recognize that "regardless of whether evidence is offered to show a defendant's 'sexual purpose' in committing the charged offense, that evidence is inadmissible under OEC 404(3) if the theory of admissibility reduces to an argument about defendant's character." *State v. Cave*, 321 Or App 81, 86, 516 P3d 279 (2022). However, that analysis does not apply because in the instant case the uncharged misconduct involved the same victim. *See State v. Tinoco-Camarena*, 311 Or App 295, 306, 489 P3d 572, *rev den*, 368 Or 561 (2021) (distinguishing *State v. McKay*, 309 Or 305, 308, 787 P2d 479 (1990) on that basis).

determine that the probative value of the prior instances of sexual contact with [the same victim] outweighed the potential for prejudice.").

        In his third and fourth assignments of error, defendant takes issue with a jury instruction permitting the jury to find defendant guilty by nonunanimous verdicts. Under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), the trial court erred in giving the instruction. However, the error was harmless because all of the jury's verdicts were unanimous. *State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020), *cert den*, ___ US ___, 141 S Ct 2837 (2021).

        Finally, the state concedes that it was plain error for the trial court to order defendant to pay $500 in attorney fees. We agree and accept the concession. For the reasons stated in *State v. Harris*, 293 Or App 110, 111-12, 426 P3d 252 (2018), we conclude that it is appropriate to exercise our discretion to correct the error. Accordingly, we reverse the portion of the judgment requiring defendant to pay $500 in attorney fees.

        Portion of judgment requiring defendant to pay attorney fees reversed; otherwise affirmed.